Appeal No. 16-2179

_____

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

_____

AMGEN INC. and AMGEN MANUFACTURING, LIMITED,

*Plaintiffs-Appellants,*

v.

HOSPIRA, INC.,

*Defendant-Appellee.*

_____

Appeal from the United States District Court for the District of Delaware in
Case No. 1:15-cv-00839-RGA, Judge Richard G. Andrews

_____

## MOTION TO DISMISS AMGEN INC. AND AMGEN MANUFACTURING, LIMITED'S APPEAL FOR LACK OF JURISDICTION

WILLKIE FARR & GALLAGHER LLP

THOMAS J. MELORO
MICHAEL W. JOHNSON
787 Seventh Avenue
New York, NY 10019-6099
(212) 728-8000

*Counsel for Defendant-Appellee, Hospira, Inc.*

Dated:  July 8, 2016

# TABLE OF CONTENTS

I.      PROCEDURAL BACKGROUND................................................................................1

II.     ARGUMENT .........................................................................................................5

        A.      The Court Of Appeals' Jurisdiction Is Limited To Review Of Final
                Decisions And The Limited "Collateral Order" Exception ....................................5

        B.      The Supreme Court and Federal Circuit Have Generally Denied Review
                Of Pretrial Discovery Orders Prior To Final Judgment ..........................................8

        C.      The District Court's Discovery Ruling Does Not Qualify As A Collateral
                Order ................................................................................................................11

                1.      Pretrial Discovery Rulings Are Appealable From A Final
                        Judgment ...............................................................................................12

                2.      The District Court's Discovery Ruling Did Not Resolve An
                        Important Issue Completely Separate From The Merits Of The
                        Action....................................................................................................14

III.    CONCLUSION AND RELIEF SOUGHT .....................................................................16

IV.     STATEMENT OF CONSENT OR OPPOSITION ...........................................................17

CERTIFICATE OF INTEREST ................................................................................18

# TABLE OF AUTHORITIES

**Case**                                                                  **Page(s)**

*Baker Perkins, Inc. v. Werner & Pfleiderer Corp.*,
  710 F.2d 1561 (Fed. Cir. 1983) .......................................................7

*Boughton v. Cotter Corp.*,
  10 F.3d 746 (10th Cir. 1993) ...........................................................13

*Cabot Corp. v. United States*,
  788 F.2d 1539 (Fed. Cir. 1986) .................................................5, 7

*In re Carco Electronics*,
  536 F.3d 211 (3d Cir. 2008) .............................................................12

*Cohen v. Beneficial Indus., Loan Corp.*,
  337 U.S. 541 (1949).................................................................6, 14

*Competitive Techs., Inc. v. Fujitsu Ltd.*,
  374 F.3d 1098 (Fed. Cir. 2004) ...............................................7, 14

*Connaught Labs., Inc. v. SmithKline Beecham P.L.C.*,
  165 F.3d 1368 (Fed. Cir. 1999) ...............................................9, 13

*Coopers & Lybrand*,
  437 U.S. 463 (1978)...........................................................................14

*DeMasi v. Weiss*,
  669 F.2d 114 (3d Cir. 1982) .............................................................12

*Digital Equipment Corp. v. Desktop Direct Inc.*,
  511 U.S. 863 (1994)..............................................................................8

*Eastern Maico Distributors, Inc. v. Maico-Fahrzeugfabrik*, G.m.b.H.,
  658 F.2d 944 (3d Cir. 1981) .............................................................16

*Firestone Tire & Rubber Co. v. Risjord*,
  449 U.S. 368 (1981)..............................................................................8

*Flanagan v. United States*,
465 U.S. 259 (1984)..................................................................5

*Jeannette Sheet Glass Corp. v. United States*,
803 F.2d 1576 (Fed. Cir. 1986) .........................................5, 7, 13

*Knoll Pharm., Co. v. Teva Pharm., USA, Inc.*,
138 F. App'x. 302 (Fed. Cir. 2005).............................................12

*Micro Motion, Inc. v. Exac Corp.*,
876 F.2d 1574 (Fed. Cir. 1989) ..................................................9

*Mohawk Indus., Inc. v. Carpenter*,
558 U.S. 100 (2009)..............................................6, 8, 10, 11, 15

*Montgomery Ward & Co. v. Zenith Radio Corp.*,
673 F.2d 1254 (C.C.P.A.1982) ....................................................9

*Puerto Rico Aqueduct & Sewer Authority v. Metcalf & Eddy, Inc.*,
506 U.S. 139 (1993)...........................................................7, 8, 12

*Quantum Corp. v. Tandon Corp.*,
940 F.2d 642 (Fed. Cir. 1991) ............................................9, 13, 14

*Reise v. Bd. of Regents of Univ. of Wisconsin Sys.*,
957 F.2d 293 (7th Cir. 1992) .....................................................15

*Richardson-Merrell, Inc. v. Koller*,
472 U.S. 424 (1985)..............................................................8, 15

*Solarex Corp. v. Arco Solar, Inc.*,
870 F.2d 642 (Fed. Cir. 1989) ....................................................9

*Will v. Hallock*,
546 U.S. 345 (2006)..................................................................6

**Statutes, Rules and Regulations**

28 U.S.C. § 1291 .....................................................................5

28 U.S.C. §1295(a)(1).............................................................................5

**Other Authorities**

Aaron S. Bayer, *The collateral order doctrine after 'Mohawk,'*
    Nat'l L.J., Feb 8, 2010 .............................................................10

15B C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3914.23
    (2d ed. 1992).........................................................................8

Pursuant to Rule 27(f) of the Rules of this Court, Hospira, Inc. ("Hospira") respectfully requests that the Court dismiss the appeal of Amgen Inc. and Amgen Manufacturing, Limited (collectively, "Amgen") for lack of jurisdiction. As set forth more fully below, this Court lacks jurisdiction over Amgen's appeal of the district court's discovery ruling because the discovery ruling is neither a "final decision" of the district court nor a collateral order.

## I.    **PROCEDURAL BACKGROUND**

Amgen initiated this action by filing a complaint against Hospira on September 18, 2015 (the "Initial Complaint"). The Initial Complaint alleged various causes of action based on the Biologics Price Competition and Innovation Act (the "BPCIA"), 42 U.S.C. § 262, including separate statutory violations of paragraphs (*l*)(8)(A) ("paragraph (8)(A)") and (*l*)(2)(A) ("paragraph (2)(A)") of the BPCIA. On October 13, 2015, Hospira moved to dismiss Counts I and II of the Initial Complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) (the "Initial Motion"). In response to the Initial Motion, Amgen filed an amended complaint on November 6, 2015 (the "Amended Complaint") withdrawing the claim alleging a violation of paragraph (*l*)(2)(A) as previously set forth in Count II of the Initial Complaint. The Amended Complaint (as did the Initial Complaint) also alleges one count of patent infringement under 35 U.S.C. § 271(e)(2)(C) and two counts of patent infringement under 35 U.S.C. § 271(a). However, the asserted patents are

currently expired. Hospira moved to dismiss Count I of the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) on November 12, 2015. That pending motion was fully briefed and oral argument was held on February 16, 2016.

The subject matter of this case relates principally to two particular aspects of Hospira's biologically similar product. One aspect relates to the cells used to produce the protein in Hospira's product. The other concerns the nature of the protein in Hospira's product. Specifically, U.S. Patent No. 5,756,349 (the "'349 Patent") is directed to cells which are capable of producing erythropoietin; and U.S. Patent No. 5,856,298 is directed to specific erythropoietin isoforms contained in the product.

In Amgen's First Set of Requests for Production (Nos. 1-34) served on February 11, 2016, and Amgen's First Set of Interrogatories (No. 1) served on March 2, 2016, Amgen sought discovery regarding the composition of the cell culture media used in Hospira's manufacturing process. On March 30 and April 1, respectively, Hospira objected to providing the requested information because it was not relevant to any claim or defense currently at issue in this case.

After multiple discussions, the parties reached an impasse when Hospira maintained its refusal to produce the requested information. Pursuant to the district court's procedures, the parties submitted letter briefs setting forth their respective

arguments. Hospira argued that Amgen was (and is) interested in the discovery not to support its current claims, but to discover Hospira's confidential information in order to assess whether it could expand the scope of the current litigation by adding additional patents to this lawsuit. Hospira argued that such a pursuit is improper and prohibited by Federal Rule of Civil Procedure 26.

The district court held oral argument on May 4, 2016. The district court specifically questioned Amgen on the relevance of its requested discovery. Amgen in fact admitted that the information it was seeking was potentially relevant to "additional patents Amgen owns." (*See* Declaration of Michael W. Johnson ("Johnson Decl."), Exhibit 1, at 6:1-5). Perhaps realizing its startling (and candid) concession, Amgen then attempted to re-frame its argument by suggesting that the specific composition of Hospira's culture medium was relevant to the limitation of claim 7 of the '349 Patent.[1]

The district court ruled that Amgen could not obtain the requested discovery to expand the scope of the current litigation. Specifically, Amgen would not be permitted to discover this information in order assess, and potentially bring, additional infringement claims based on patents that are not at issue in the case. In

---

[1]     The limitation of claim 7 of the '349 Patent recites, *inter alia*, culturing vertebrate cells under suitable nutrient conditions.

denying the requested discovery, the district court specifically referred to Amgen's pursuit as a "fishing expedition." (*Id.* at 40:3-7.)[2]

Amgen's appeal arises from the district court's denial of Amgen's motion to compel, among other things, the production of information regarding the composition of the cell culture medium used in manufacturing Hospira's product— documents which Hospira argued and which the district court ruled are irrelevant to Amgen's asserted claims in this ongoing case.[3]  For the reasons set forth below, the district court's discovery ruling is not a final decision and does not qualify as a collateral order.  Consequently, Amgen's appeal must be dismissed for lack of jurisdiction.

---

[2]     The district court did provide that certain information concerning the cell culture medium components should be produced by Hospira, but *only if* Hospira contested the infringement of the limitation of claim 7 of the '349 Patent relating to the culturing of the cells.  On May 13, Hospira notified Amgen that it would not contest that its process meets the claim 7 limitation of "culturing, under suitable nutrient conditions, vertebrate cells." Accordingly, Hospira is not required to produce the information.

[3]     As part of the same discovery application, Amgen also sought the production of all of Hospira's communications with the FDA regarding Hospira's product, even though Hospira had already agreed to produce the communications relevant to Amgen's infringement claims.  The district court ruled that "Hospira has drawn the right line" and that communications relating to other patents not at issue in the case would not be relevant, and denied Amgen's broader discovery request.  (Johnson Decl., Exhibit 1 at 36:16-37:8.)

II.    <u>ARGUMENT</u>

A.    **THE COURT OF APPEALS' JURISDICTION IS LIMITED TO REVIEW OF FINAL DECISIONS AND THE LIMITED "COLLATERAL ORDER" EXCEPTION**

The Courts of Appeals' jurisdiction is limited to the review of "final decisions of district courts." 28 U.S.C. §§ 1291, 1295(a)(1). The requirement of finality has been called a "historic characteristic of federal appellate procedure." *Flanagan v. United States*, 465 U.S. 259, 263 (1984). The final judgment rule requires that "a party must ordinarily raise all claims of error in a single appeal following final judgment on the merits." *Id.* The Supreme Court has consistently held that as a general rule an order is final only when it "ends the litigation on the merits and leaves nothing for the court to do but execute judgment." *Cabot Corp. v. United States*, 788 F.2d 1539, 1542 (Fed. Cir. 1986) (citations omitted). There are several important interests served by the final judgment rule:

> It helps preserve the respect due trial judges by minimizing appellate-court interference with the numerous decisions they must make in the prejudgment stages of litigation. It reduces the ability of litigants to harass opponents and to clog the courts through a succession of costly and time-consuming appeals. It is crucial to the efficient administration of justice.

*Flanagan*, 465 U.S. at 263-64. The "final order rule" reflects a "strong congressional policy against piecemeal reviews and against obstructing or impeding an ongoing judicial proceeding by interlocutory appeals." *Jeannette*

- 5 -

*Sheet Glass Corp. v. United States*, 803 F.2d 1576, 1581 (Fed. Cir. 1986) (citations omitted).

Although "final decisions" typically are ones that trigger the entry of judgment, they also include a small set of prejudgment orders that are "collateral to" the merits of an action and "too important" to be denied immediate review. *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 103 (2009) (citing to *Cohen v. Beneficial Indus., Loan Corp.*, 337 U.S. 541, 546 (1949)).  In *Cohen*, pursuant to a state statute, the corporate defendant in a shareholder derivative action sought indemnity for the expenses and attorney's fees of its defense from the shareholder who had brought the suit.  337 U.S. at 545.  While the Supreme Court held that the district court's order refusing to apply the statute was not a final judgment, it also created an exception to the final judgment rule.  This exception permits immediate appeals from orders that "fall in that small class which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated."  *Id*. at 546.

But, the Supreme Court has stressed that the collateral order doctrine must "never be allowed to swallow the general rule that a party is entitled to a single appeal, to be deferred until that final judgment has been entered."  *Mohawk Indus.*,

558 U.S. at 106 (citations omitted); *see also Will v. Hallock*, 546 U.S. 345, 350 (2006) ("emphasizing [the doctrine's] modest scope").

The Federal Circuit has long held that departure from the final judgment rule would be allowed "only for the *limited* category of cases falling within the 'collateral order' exception delineated in *Cohen*…." *Cabot Corp. v. United States*, 788 F.2d 1539, 1543 (Fed. Cir. 1986) (emphasis added). That "exception" is a "narrow" one whose reach is limited to trial court orders affecting rights that will be "irretrievably lost" in the absence of an immediate appeal. *Jeannette Sheet Glass Corp. v. United States*, 803 F.2d 1576, 1581 (Fed. Cir. 1986) (quoting *Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424 (1985)); *see also Baker Perkins, Inc. v. Werner & Pfleiderer Corp.*, 710 F.2d 1561, 1564 (Fed. Cir. 1983).

One "narrow" exception applies where a defense of sovereign immunity has been asserted. *See Competitive Techs., Inc. v. Fujitsu Ltd.*, 374 F.3d 1098, 1102 (Fed. Cir. 2004). For example, in *Puerto Rico Aqueduct & Sewer Authority v. Metcalf & Eddy, Inc.*, 506 U.S. 139 (1993), the Puerto Rico Aqueduct and Sewer Authority (the "Authority") moved to dismiss the case on Eleventh Amendment grounds. The Authority claimed that the suit was prohibited because the Authority was an "arm of the State." *Id.* at 141. The district court found the Eleventh Amendment inapplicable, and the Court of Appeals for the First Circuit dismissed the Authority's appeal for want of jurisdiction, holding that the order was not

appealable because it was not a collateral order and because there was no final judgment. *Id.* at 142. The Supreme Court reversed the First Circuit, holding "that States and state entities that claim to be 'arms of the State' may take advantage of the collateral order doctrine to appeal a district court order denying a claim of Eleventh Amendment immunity." *Id.* at 147.

## B. THE SUPREME COURT AND FEDERAL CIRCUIT HAVE GENERALLY DENIED REVIEW OF PRETRIAL DISCOVERY ORDERS PRIOR TO FINAL JUDGMENT

The Supreme Court has "routinely require[d] litigants to wait until after final judgment to vindicate valuable rights, including rights central to our adversarial system." *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 108-09 (2009). For example, in *Richardson-Merrell*, the Supreme Court held that an order disqualifying counsel in a civil case did not qualify for immediate appeal under the collateral order doctrine. 472 U.S. at 426. It reached the same decision in *Flanagan*, despite the fact that *Flanagan* was a criminal case and Sixth Amendment rights were implicated. 465 U.S. at 260. In *Digital Equipment Corp. v. Desktop Direct Inc.*, 511 U.S. 863 (1994), the Supreme Court rejected an assertion that collateral order review was necessary to promote "the public policy favoring voluntary resolution of disputes." *Id.* at 881.

Similarly, the Supreme Court has "generally denied review of pretrial discovery orders." *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 377

(1981); *see also* 15B C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3914.23 at 123 (2d ed. 1992) ("[T]he rule remains settled that most discovery rulings are not final."). The Federal Circuit has followed stride, consistently holding that "it is settled that discovery orders issued within the context of a primary proceeding are generally not appealable orders." *Quantum Corp. v. Tandon Corp.*, 940 F.2d 642, 644 n.2 (Fed. Cir. 1991) (citing 9 Moore's Federal Practice ¶ 110.13[2]); *see also Connaught Labs., Inc. v. SmithKline Beecham P.L.C.*, 165 F.3d 1368, 1370 (Fed. Cir. 1999) (holding that discovery orders are not final decisions and are therefore not generally appealable until final judgment); *Micro Motion, Inc. v. Exac Corp.*, 876 F.2d 1574, 1577 (Fed. Cir. 1989) ("the Supreme Court has repeatedly held that an order denying a motion to quash, or an order compelling testimony or production of documents, is not final and, hence, is not appealable regardless of how the matter is raised"); *Solarex Corp. v. Arco Solar, Inc.*, 870 F.2d 642, 643 (Fed. Cir. 1989) ("Discovery orders made by a court in which a case is pending are not appealable as of right, being merely interlocutory, until the entry of final judgment in a suit."). *Cf. Montgomery Ward & Co. v. Zenith Radio Corp.*, 673 F.2d 1254, 1259 (C.C.P.A.1982) (noting that while interlocutory discovery orders are generally not appealable, some courts have recognized an exception where the information sought is in the custody of a third party and the putative appellant can neither resist nor force the custodian to

resist compliance with the discovery order).  In recent years, the federal appellate courts have signaled "a further retrenchment" to the collateral order doctrine. Aaron S. Bayer, *The collateral order doctrine after 'Mohawk,'* NAT'L L.J., Feb 8, 2010.  This trend is exemplified by the Supreme Court's ruling in *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100 (2009).

The facts of *Mohawk* are relatively straightforward.  Carpenter was a former employee suing his employer (Mohawk), alleging that his termination violated federal statute because it had amounted to a conspiracy on the part of Mohawk to deter Carpenter from testifying in a separate federal suit alleging Mohawk's hiring of undocumented immigrants.  The district court granted Carpenter's motion to compel the disclosure of information related to his pre-termination interview with Mohawk's attorney, over Mohawk's objection on attorney-client privilege grounds.  Mohawk appealed to the United States Court of Appeals for the Eleventh Circuit, petitioning for a writ of mandamus to compel the district court to vacate its order.  The Eleventh Circuit dismissed the appeal.  Mohawk then appealed to the Supreme Court.

The Supreme Court reiterated that in applying *Cohen*'s collateral order doctrine, "we have stressed that it must 'never be allowed to swallow the general rule that a party is entitled to a single appeal, to be deferred until final judgment has been entered.'"  *Id.* at 106 (quoting *Digital Equipment Corp. v. Desktop Direct,*

*Inc.*, 511 U.S. 863, 868 (1994)).  While readily acknowledging the importance of the attorney-client privilege, the Supreme Court did not focus on whether an interest is "important in the abstract."  *Id.* at 108.  Rather, the crucial question is "whether deferring review until final judgment so imperils the interest as to justify the cost of allowing immediate appeal of the entire class of relevant orders."  *Id.*

The *Mohawk* Court concluded that post-judgment appeals "generally suffice to protect the rights of litigants and ensure the vitality of the attorney client privilege" and that the appellate courts "can remedy the improper disclosure of privileged material in the same way they remedy a host of other erroneous evidentiary rulings:  by vacating an adverse judgment and remanding for a new trial in which the protected material and its fruits are excluded from evidence."  *Id.* at 109.  The same principles articulated by the Supreme Court in *Mohawk* apply to this appeal.  Amgen seeks interlocutory relief from a discovery ruling that, if necessary, is readily curable by a post-judgment appeal.  Accordingly, Amgen's appeal should be dismissed.

## C.    THE DISTRICT COURT'S DISCOVERY RULING DOES NOT QUALIFY AS A COLLATERAL ORDER

The Supreme Court has defined the limited class of final "collateral orders" in these terms:  "[T]he order must [1] conclusively determine the disputed question, [2] resolve an important issue completely separate from the merits of the action, and [3] be effectively unreviewable on appeal from a final judgment."

*Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144 (1993).  Amgen will be unable to show that the collateral order doctrine applies to the district court's discovery ruling.[4]

1.  <u>Pretrial Discovery Rulings Are Appealable From A Final Judgment</u>

In Amgen's Docketing Statement (D.I. 7), it describes the judgment/order appealed from as follows:  "[i]n its May 4, 2016 ruling, the ***district court denied Plaintiffs' request for an order to compel Defendant to produce certain manufacturing information*** that Defendant failed to disclose under 42 U.S.C. § 262(*l*)(2)(A)."  (emphasis added).

Fatal to Amgen's appeal is that the district court's discovery ruling *is* reviewable on appeal from a final judgment.  *See In re Carco Electronics*, 536 F.3d 211, 214 (3d Cir. 2008) ("The order here grants protection from disclosure, and as with any other garden variety discovery order, may be appealed in due course ***and only when a final order is entered***.") (emphasis added); *DeMasi v. Weiss*, 669 F.2d 114, 121 (3d Cir. 1982) (opining that "[i]t is settled in this court that discovery matters generally are not reviewable until after final judgment."). Indeed, Federal Circuit precedent "squarely rejects" the argument that discovery orders would be "effectively unreviewable" on appeal from a final judgment.

---

[4]     For purposes of this motion, Hospira will not contest that the district court conclusively determined the disputed question—*i.e.*, the relevancy (or lack thereof) of Amgen's requested discovery.

*Knoll Pharm., Co. v. Teva Pharm., USA, Inc.*, 138 F. App'x. 302, 303 (Fed. Cir. 2005); *see, e.g.*, *Quantum Corp. v. Tandon Corp.*, 940 F.2d 642, 644 (Fed. Cir. 1991) (holding that a discovery order directed at a party over privilege objection is "effectively reviewable" on appeal from final judgment); *Connaught Labs., Inc. v. SmithKline Beecham PLC*, 165 F.3d 1368 (Fed. Cir. 1999) (rejecting the assertion that the collateral order doctrine applied and dismissing nonparty's appeal of order compelling its employees to testify). Specifically, district court orders for the production of documents during the course of litigation are not "final orders" subject to immediate appellate review. *See Boughton v. Cotter Corp.*, 10 F.3d 746, 748 (10th Cir. 1993) (citing *Church of Scientology v. United States*, 506 U.S. 9, n.11 (1992)). For this reason alone, Amgen's appeal cannot stand.

Further, Amgen will be unable to show that it will irretrievably lose any of its rights absent an immediate appeal. *See Jeannette Sheet Glass Corp. v. United States*, 803 F.2d 1576, 1581 (Fed. Cir. 1986) (emphasizing that the *Cohen* doctrine "is a 'narrow' one whose reach is *limited* to trial court orders affecting rights that will be 'irretrievably lost' in the absence of an immediate appeal") (quoting *Richardson-Merrell, Inc. v. Koller*, 424 U.S. 472, 430-31 (1985) (emphasis added)).

2.    The District Court's Discovery Ruling Did Not Resolve An Important Issue Completely Separate From The Merits Of The Action

This Court has held that "in addition to not complying with the third requirement of the *Cohen* doctrine"—*i.e.*, that decisions must be effectively unreviewable on appeal from the final judgment in the underlying action—discovery orders "may present issues not completely separate from the merits and thus the orders are not truly collateral under the second requirement of the *Cohen* doctrine." *Quantum Corp.*, 940 F.2d at 644, n.2.

Issues that are "enmeshed in the factual and legal issues comprising the plaintiff's cause of action" are not appealable under the collateral order doctrine. *Coopers & Lybrand*, 437 U.S. 463, 469 (1978); *see also Competitive Techs., Inc. v. Fujitsu Ltd.*, 374 F.3d 1098, 1104 (Fed. Cir. 2004) (opining that consideration of the issue being appealed prior to final judgment might be "particularly inappropriate because the issues remaining for the district court to decide [...] are themselves intimately bound up with the merits"). It is necessary that orders be "not of such an interlocutory nature as to affect, or to be affected by, decision of the merits of th[e] case." *Cohen*, 337 U.S. at 546. "Were such orders to be appealable before trial, a flood of piecemeal appeals would undoubtedly ensue." *Quantum Corp.*, 940 F.2d at 644, n.2.

The policy against appellate review of interlocutory discovery orders is underscored by the fact that "almost all interlocutory appeals from discovery orders would end in affirmance" because "the district court possesses discretion, and review is deferential." *Reise v. Bd. of Regents of Univ. of Wisconsin Sys.*, 957 F.2d 293, 295 (7th Cir. 1992); *see also Mohawk Indus.*, 558 U.S. at 110 ("Most district court rulings on these matters involve the routine application of settled legal principles" and "are unlikely to be reversed on appeal, particularly when they rest on factual determinations for which appellate deference is the norm."); *see also Richardson-Merrell*, 472 U.S. at 434 ("Most pretrial orders of district judges are ultimately affirmed by appellate courts.").

During the May 4, 2016 hearing, the district court denied Amgen's request for cell culture medium documents to the extent that Amgen could discover information that may enable it to expand the current scope of the litigation by raising new infringement claims on additional patents. Amgen describes its appeal as follows:

> Whether in this patent infringement lawsuit filed pursuant to the BPCIA, 35 U.S.C. § 271(e)(2), and pursuant to a discovery request as contemplated in *Amgen Inc. v. Sandoz Inc.*, 794 F.3d 1347, 1356 (Fed. Cir. 2015), must the Defendant-biosimilar-applicant provide in discovery information regarding the process or processes of manufacturing its biosimilar product, which the Defendant-biosimilar applicant did not provide to Plaintiff-reference-product-sponsor during the pre-suit information disclosure under the BPCIA, 42 U.S.C. § 262(*l*)(2)(A).

(Amgen's Docketing Statement (D.I. 7).) In order to resolve the question of whether the documents requested by Amgen were relevant to its current claims, this Court would necessarily have to consider Amgen's claims against Hospira and "reach some conclusion as to the relative importance of the discovered material." *Eastern Maico Distributors, Inc. v. Maico-Fahrzeugfabrik*, G.m.b.H., 658 F.2d 944, 947 (3d Cir. 1981).

This appeal is the latest embodiment of a concerted and misguided campaign by Amgen to obtain documents that it is not entitled to under either the BPCIA or the Federal Rules of Civil Procedure, as correctly determined by the lower court. In any case, to the extent that Amgen could theoretically prove on appeal that it is entitled to these documents under either the BPCIA or the Federal Rules (which it could not), wading into the merits of this case prior to final judgment is untimely, improper, and inconsistent with both Supreme Court and Federal Circuit precedence.

## III.   <u>CONCLUSION AND RELIEF SOUGHT</u>

Hospira respectfully requests that this appeal be dismissed for lack of jurisdiction.

## IV.    STATEMENT OF CONSENT OR OPPOSITION

Pursuant to Federal Circuit Rule 27, counsel for Hospira notified counsel for Amgen that it would file this motion to dismiss Amgen's appeal for lack of jurisdiction.  On July 8, counsel for Amgen notified counsel for Hospira that it would not withdraw its appeal, and thus Hospira believes that Amgen will oppose the relief sought by this motion.  Hospira believes that Amgen will be filing a response.

Dated:  July 8, 2016

Respectfully submitted,

/s/ Thomas J. Meloro
THOMAS J. MELORO
*Counsel of Record*
MICHAEL W. JOHNSON
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019-6099
Telephone:  (212) 728-8000

*Counsel for Defendant-Appellee Hospira, Inc.*

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Amgen Inc., Amgen Manufacturing LTD.,    **v.**    Hospira, Inc.

Case No.    16-2179

## CERTIFICATE OF INTEREST

Counsel for the:

☐ (petitioner) ☐ (appellant) ☐ (respondent) ☒ (appellee) ☐ (amicus) ☐ (name of party)

Hospira, Inc.

certifies the following (use "None" if applicable; use extra sheets if necessary):

| 1. Full Name of Party Represented by me | 2. Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is: | 3. Parent corporations and publicly held companies that own 10 % or more of stock in the party |
|---|---|---|
| Hospira, Inc. | N/A | Pfizer Holdings Int'l Corp., Pfizer, Inc. |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

4.   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (**and who have not or will not enter an appearance in this case**) are:

Willkie Farr & Gallagher, LLP: Thomas J. Meloro, Michael W. Johnson; Proctor Heyman Enerio LLP: Dominick Gattuso

6/21/2016

Date

/s/ Thomas J. Meloro

Signature of counsel

Please Note: All questions must be answered

Thomas J. Meloro

Printed name of counsel

cc:    N/A

Reset Fields

Appeal No. 16-2179

_____

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

_____

AMGEN INC. and AMGEN MANUFACTURING, LIMITED,

*Plaintiffs-Appellants,*

v.

HOSPIRA, INC.,

*Defendant-Appellee.*

_____

Appeal from the United States District Court for the District of Delaware in
Case No. 1:15-cv-00839-RGA, Judge Richard G. Andrews

_____

## <u>DECLARATION OF MICHAEL W. JOHNSON</u>

I, Michael W. Johnson, declare as follows:

1.      I am a partner at the law firm of Willkie Farr & Gallagher LLP,
counsel to Appellee-Defendant Hospira, Inc. ("Hospira") in the above-captioned
action.  I was admitted to this Court on November 15, 2006.  Pursuant to Federal
Circuit Rule 27(a)(8), I submit this declaration in support of Hospira's Motion to
Dismiss Amgen Inc. and Amgen Manufacturing, Limited's Appeal for Lack of
Jurisdiction.

2.      Attached as Exhibit 1 is a true and correct copy of the Transcript of
Proceedings from the May 4, 2016 Discovery Conference.

I declare under the penalty of perjury my belief that the foregoing is true and correct.  Executed on the 8th day of July, 2016.

_____

Michael W. Johnson

# EXHIBIT 1

1

```
 1                UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF DELAWARE
 3
 4    AMGEN INC., et al.,      :   CA NO. 15-839-RGA
 5                             :
 6             Plaintiffs,     :
 7                             :
 8        v.                   :   May 4, 2016
 9                             :
10    HOSPIRA, INC.,           :
11                             :
12             Defendant,      :   1:32 o'clock p.m.
13    ...........................:
14
15
16             TRANSCRIPT OF DISCOVERY DISPUTE
17         BEFORE THE HONORABLE RICHARD G. ANDREWS
18              UNITED STATES DISTRICT JUDGE
19
20
21    APPEARANCES:
22
23    For Plaintiffs:   MORRIS, NICHOLS, ARSHT & TUNNELL
24               BY:  MARYELLEN NOREIKA, ESQ
25                         -and-
```

2

```
 1               MARSHALL, GERSTEIN & BORUN LLP
 2               BY:  JOHN R. LABBE, ESQ
 3
 4
 5    For Defendant:    PROCTOR HEYMAN & ENERIO LLP
 6               BY:  DOMINICK T. GATTUSO, ESQ
 7                         -and-
 8               WILLKIE FARR & GALLAGHER LLP
 9               BY:  THOMAS J. MELORO, ESQ
10
11
12
13
14
15
16
17
18
19
20    Court Reporter:   LEONARD A. DIBBS
21               Official Court Reporter
22
23
24
25
```

3

```
 1                  P R O C E E D I N G S
 2
 3        (The proceedings occurred at 1:32 o'clock p.m. as
 4    follows:)
 5        THE COURT:  Good afternoon, everyone.  Please be
 6    seated.
 7        This is Amgen v. Hospira, Civil Action No. 15-839.
 8    Ms. Noreika, good afternoon.
 9        MS. NOREIKA:  Good afternoon, your Honor.
10        I'm here representing the plaintiff with my co-counsel,
11    John Labbe, from the Marshall Gerstein firm in Chicago.
12        THE COURT:  All right.
13        MR. LABBE:  Good afternoon, your Honor.
14        THE COURT:  Good afternoon.
15        Nice to see your, Mr. Labbe.
16        Have I seen you before.
17        MR. LABBE:  Yes.  We were here for the Case Management
18    Conference and argued the Motion to Dismiss.  I was in Court for
19    the Motion to Dismiss in February.
20        THE COURT:  Okay.  So maybe the question I should have
21    asked is, have I heard you before?
22        MR. LABBE:  Only briefly at the Case Management
23    Conference.
24        THE COURT:  Okay.  All right.
25        Mr. Gattuso.
```

4

```
 1        MR. GATTUSO:  Good afternoon, your Honor.
 2    I'm here with Tom Meloro from Willkie Farr.
 3        MR. MELORO:  Good afternoon, your honor.
 4        THE COURT:  Good afternoon, Mr. Meloro.
 5        So I read your letters.  And why don't we talk about
 6    the first thing first.
 7        And why don't you start off, Mr. Labbe, with what
 8    exactly is it that you want to get from Hospira in terms of --
 9    well, what is it that you want to get in the first request?
10        MR. LABBE:  Your Honor, in our first request, we're
11    seeking specific manufacturing information regarding the product
12    in suit, and its manufacturing information that Hospira was
13    required to provide to us under Paragraph(2)(a) of the BPCIA.
14        And under Amgen vs. Sandoz --
15        THE COURT:  So this manufacturing information, I
16    thought I saw something where they said something like, you want
17    to get four products that went into their -- that were involved
18    in, somehow or other, in their production of this biologic.
19        MR. LABBE:  The specific information that we're seeking
20    -- and this is one of reasons we don't think this is a fishing
21    expedition is -- we've identified the specific information.
22        It's four components of their cell culture medium that
23    we're requesting the complete ingredient list for.
24        And then --
25        THE COURT:  So, cell culture medium, you know, my
```

5

1  knowledge of this if from 9th grade biology, that this is some

2  kind of substance that the cell, or the precursor of the cell,

3  exists when it's making the cell that is claimed in the patent?

4      MR. LABBE:  That's correct, your Honor.

00:03:58 5      So the product here is a biologic, and it's a protein,

6  and the protein is made in recombinant cells.  And the cells are

7  grown in a mixture.  You might call it a soup.  I think Mr.

8  Meloro used that term in the past.

9      The cell culture medium is the medium in which the

00:04:18 10  cells are grown.  And, in the commercial process, they do this

11  in large vats that are able to grow many cells at one time.

12      And, so, the cell culture medium is made up of

13  particular components.  And one thing that's --

14      THE COURT:  And just give me like a for example kind of

00:04:34 15  thing.

16      What kind of components would be in cell culture

17  medium?

18      MR. LABBE:  Well, the most common example would be

19  amino acids.  Amino acids are the building blocks of proteins.

00:04:44 20  And there may be information about amino acids in the BLA, for

21  example, but there is not complete information about everything,

22  but other things that may be included in the cell culture

23  medium.

24      THE COURT:  So amino acids, things like amino acids

00:05:02 25  would be in the cell culture medium.

6

1      And the reason -- and I only have the haziest knowledge

2  of this -- for the reason why this is relevant to your patent

3  claims is what?

4      MR. LABBE:  It's potentially relevant to additional

00:05:14 5  patents that Amgen owns.

6      THE COURT:  Well, let's skip the additional patents,

7  all right?

8      Is it relevant to the patents that you've actually

9  asserted so far?

00:05:24 10      MR. LABBE:  It may be relevant to one of the claims of

11  the Lin patent.  Claim 7 of the Lin patent that calls for a

12  suitable cell culture conditions.

13      But I would like the opportunity to make the broader

14  point here, though --

00:05:40 15      THE COURT:  Well, I'll let you do that in a second.

16      Claim 7 of the Lin patent, because the element of that

17  has something to do with the culture medium?

18      MR. LABBE:  Claim 7 of the Lin patent is a processing

19  of producing erythropoietin comprising a step of culturing,

00:06:02 20  under suitable nutrient conditions, vertebrate cells according

21  to Claims 1, 2, 3, 4, 5, and 6.

22      THE COURT:  And so, the suitable nutrient conditions,

23  does that maybe include the culture medium?

24      MR. LABBE:  Correct, your Honor.  So the composition of

00:06:16 25  the cell culture medium would certainly fall within the scope of

7

1  relevance, in our view, to that claim.

2      THE COURT:  Okay.  So that's your narrower argument.

3  You have a broader argument?

4      MR. LABBE:  Your Honor, the broader argument is that

00:06:32 5  the information is relevant to this case to the extent that this

6  is a case that Amgen has brought under the BPCIA in an effort to

7  resolve patent disputes regarding Hospira's product in advance

8  of the launch of the product.  And that's the entire purpose of

9  the BPCIA.

00:06:48 10      We can't know for certain what information -- what the

11  information says without reviewing the information, as is often

12  the case with discovery.

13      THE COURT:  But isn't the way that goes, is that they

14  produced their aBLA, and then you reasonably assert the patents

00:07:10 15  you think might be implicated by whatever it is they told you

16  they were doing?

17      MR. LABBE:  Well, that leads to one important point,

18  your Honor.  That Section (2)(a) of the statute says that they

19  are to produce their application, and such other information

00:07:22 20  that describes the process or processes used to manufacture a

21  biological product.

22      And that's important here, because there's a

23  distinction between the BPCIA and Hatch-Waxman.

24      Under Hatch-Waxman, you can only assert a 271(E) claim

00:07:38 25  of infringement based on patents regarding the product, itself,

8

1  or methods of use of the product, but under the BPCIA you can

2  also assert patents based on the manufacture of the product.

3      And this is the reason that it would, A, the

4  information exchange process requires that the applicant provide

00:07:52 5  the manufacturing information as well.

6      And then Amgen is required --

7      THE COURT:  I'm sorry.  You said "provide the

8  manufacturing information."

9      The language of the statute, which you probably have in

00:08:02 10  front of you --

11      MR. LABBE:  Yes, I do.

12      THE COURT:  -- but it's, essentially, the aBLA and

13  other information, or something like that?

14      MR. LABBE:  And such other information that describes

00:08:12 15  the process or processes used to manufacture the biological

16  product that is the subject of such application.

17      THE COURT:  Okay.

18      MR. LABBE:  So it, specifically, requires that the

19  information regarding manufacturing be provided.

00:08:26 20      And we did raise this issue during the information

21  exchange process.  The first three exhibits are correspondence

22  to Hospira during the information exchange process where we said

23  that they should provide this information.

24      This would have been about year ago, because it's

00:08:40 25  required under the BPCIA.

9

1    And you're correct, that Amgen is required to provide a
2    list of patents that are reasonably believed Hospira would
3    infringe.  But it's a reasonableness requirement, it's not a
4    speculation requirement, an uninformed speculation requirement.
00:08:58
5    Amgen is not required to list patents for which it
6    lacks information.  Amgen is entitled to the information and
7    then it can list the patents.  Under Hospira's reading of the
8    statute, it would be able to prevent Amgen from ever reviewing
9    the information.
00:09:14
10   THE COURT:  And, I'm sorry, Mr. Labbe.
11   In terms of the aBLA, which I think I've heard Mr.
12   Meloro, or one of his cohorts say is 700,000 pages, or some
13   other ridiculous number, does it describe what goes into the
14   cell culture medium?
00:09:30
15   MR. LABBE:  It does to an extent, your Honor, yes, but
16   it does not include the information that we've requested.  It
17   specific information regarding the four components.  It
18   identifies those four components, but it doesn't provide a
19   complete ingredient list for those four components.
00:09:48
20   And that is what we've -- and they've never pointed to
21   a place where that information is provided in the aBLA.
22   We said this in our letters to them that that
23   information is lacking.  And even though the BLA may be hundreds
24   of thousands of pages, the fact remains that it lacks this
00:10:04
25   specific manufacturing information, and the statute calls for

10

1    the manufacturing information to be provided so that Amgen can
2    assess its patent portfolio.
3    But they're taking advantage of this abbreviated
4    pathway.  They should also be required to follow it.
00:10:20
5    And also Amgen v. Sandoz said that you couldn't have a
6    cause of action based on a violation 2(A).  It did say that
7    Sandoz was required and had, in fact, produced the required
8    information during discovery.
9    So you can't bring a cause of action based on 2(a).
00:10:36
10   And then we have the separate 8(A) issue, and that's a different
11   issue.  We can't bring a cause of action under Amgen v. Sandoz
12   based on a 2(A) violation, but we can receive the information
13   during discovery.
14   And the Federal Circuit was -- expressed a concern
00:10:50
15   about the fact that the applicant could keep the information
16   secret forever, and prevent the reference product sponsor from
17   evaluating its manufacturing patents.
18   And, in that case, the Federal Circuit found that it
19   was sufficient that the information would be provided in
00:11:04
20   discovery.  And so, it didn't find that a concern only because
21   the information would be provided in discovery.
22   If it's not provided in discovery, Amgen would never
23   get the information, and the whole purpose of the information
24   exchange process would be undermined.
00:11:18
25   THE COURT:  All right.

11

1    THE COURT:  Mr. Meloro?
2    MR. MELORO:  Thank you, your Honor.
3    The argument that Amgen sets forth really falls in the
4    end as an attempt to argue that the BPCIA trumps Rule 26 and
00:11:40
5    relevance on the discovery standards.
6    Counsel mentioned a narrow argument and a broader
7    argument.
8    The narrow argument, I don't even think Claim 7 of the
9    Lin patent was mentioned in their letter, but suffice it to say,
00:11:56
10   that simply identifying a claim limitation that refers to a --
11   not even the cell culture medium in those terms, culturing under
12   suitable nutrient conditions, doesn't place in issue, directly
13   or indirectly at this point in the case, the identity of the
14   four components.
00:12:24
15   THE COURT:  Well, you say that, but it doesn't seem to
16   me on its face to be ridiculous for Mr. Labbe to say that the
17   claim language implicates what is in the cell culture medium.
18   Is it ridiculous, what he's saying?
19   MR. MELORO:  I wouldn't use --
00:12:50
20   THE COURT:  You can use your own words.
21   MR. MELORO:  I'm responding to the exact phraseology of
22   the question.
23   The identity of those four components is not necessary
24   nor relevant to the infringement allegation in the case.  As a
00:13:08
25   matter of fact, Amgen has already provided infringement

12

1    contentions without this information, so, clearly, they're able
2    to do it.
3    We have not --
4    THE COURT:  I take it one of the things that they have
00:13:22
5    said is you infringe Claim 7?
6    MR. MELORO:  I believe they have asserted Claim 7.  I
7    don't have the contentions in front of me.
8    We have not even engaged in a substantive discussion
9    with Amgen as to whether or not there will be a contest of
00:13:36
10   infringement of Claim 7.  The issue has not been joined on that
11   particular contention, as it was provided, nor whether if there
12   is going to be a contest on infringement of Claim 7, whether the
13   identities of these four components would have anything to do
14   with it.
00:13:52
15   THE COURT:  So I don't think it's real likely that in
16   the next two weeks you're going to say, okay, we don't contest.
17   We infringe Claim 7.
18   So it's not something where I'm going to say, okay,
19   well, we're going to wait until you make up your mind on that,
00:14:08
20   which, as we all know, might be a year from now, right?  That's
21   not really much a good dodge here, is it?
22   MR. MELORO:  Well, if that were the difference in
23   relevance in the case, and the Court were inclined to think that
24   there was some relevance based on Claim 7, we'd go back and have
00:14:20
25   a hard discussion with our client that there just hasn't been

13

1  the opportunity or need to have a discussion with Amgen on this.

2      We certainly have and are serving this week invalidity

3  contentions on this '349 patent, and so, it's conceivable that

4  the case could end up being an invalidity case, or at least as

5  to Claim 7 being an invalidity case only.

6      We don't see that there is any relevance to these four

7  components of the Claim 7 infringement case, but if there were a

8  difference there, that's a discussion that we haven't had with

9  Amgen.

10      On the broader BPCIA question, there is no indication

11  in the statute that Congress intended that Rule 26 relevance be

12  somehow circumvented.

13      THE COURT:  Well, so, I -- I saw that argument in your

14  papers, and I think I appreciate that argument.

15      And, I think, Mr. Labbe is really saying that you're

16  circumventing the statutory purpose here, and so, regardless of

17  what Congress might have thought, and I'm sure they never

18  contemplated the intersection of this with the Discovery Rules,

19  or the actual -- I mean maybe they did, actually.  But in terms

20  pf how you get these things if people didn't do what the statute

21  envisioned.

22      Are you, by taking this tact, defeating the purpose

23  here?

24      MR. MELORO:  No.  In fact, it was Amgen that defeated

25  the purpose of the statute here, because Amgen was given the

14

1  information that's in the aBLA from Hospira.  And, at that

2  point, it had the opportunity to put in play whatever patents it

3  wanted to put in play that it thought could -- that it believed

4  the claim of patent infringement could reasonably be asserted,

5  and that was simply to just hand Hospira a list of those patents.

6      That was simply to just hand Hospira a list of those

7  patents, at which point, it would have been incumbent upon

8  Hospira to provide contentions of invalidity or non-infringement

9  on those patents.

10      THE COURT:  Why would -- one of the things that I was

11  at least in the back of my mind thinking about was, why would

12  Amgen narrowly assert patents, particularly when the standard,

13  you know, seemed to allow -- allowed them assert the patents of

14  3(A), probably a lot more liberally than filing a lawsuit?

15      MR. MELORO:  Without guessing as to their particular

16  motives here, why someone in their position might, perhaps to

17  try to intentionally conjure up a situation where not all

18  information requested was provided, so that an argument could be

19  made that 2(A) was violated.

20      And, although, counsel made the argument today that it

21  is not possible to bring a lawsuit for a violation of 2(A),

22  that's not the position that Amgen took at the beginning of this

23  litigation.  The original Complaint in this case had a cause of

24  action for a violation 2(A).

25      THE COURT:  But -- and the Sandoz case was decided

15

1  after that?

2      MR. MELORO:  The Sandoz case was decided in the

3  District Court beforehand.

4      MR. LABBE:  The Federal Circuit denied en banc review

5  between our original Complaint and our Amended Complaint, and

6  that was the change of circumstances that caused you to drop the

7  2(A).

8      We think under the Amgen v. Sandoz case, as it stands

9  today -- and our cert petition is pending, actually, but as it

10  stands today, we didn't think we could bring that cause of

11  action, but at the time of the original Complaint, an en banc

12  petition was pending.

13      MR. MELORO:  And so, in the original correspondence

14  between the parties, which was about a year ago, clearly

15  somebody in Amgen's shoes could have been thinking that they

16  might want to have 2(A) cause of action available to them by

17  asking for information and not getting the information.

18      THE COURT:  Do you have any other theories?

19      MR. MELORO:  There's a concept of potentially getting a

20  second bite at the apple by wanting to come into court and

21  asserting patents the way that the patent -- the so-called

22  patent dance works.  Not every patent on the 3(A) list

23  automatically ends up in litigation.

24      THE COURT:  Well, presumably, because part of it is,

25  you could give them things that wouldn't cause them to think

16

1  that it was a good idea to go forward a particular patent.

2      MR. MELORO:  Or, even if they wanted to go forward on a

3  particular patent, there's a negotiation about the number of

4  patents that would be included in the first-wave lawsuit that

5  could, conceivably, result in the plaintiff not being able to

6  assert all the patents that they would like to assert, even if

7  they think they have good grounds to do that in a first-wave

8  lawsuit.

9      THE COURT:  Do you, Mr. Labbe, have anything to add as

10  to why a company, in the position of Amgen, might be taking

11  conservative approaches as to what to name in their 3(A) patent

12  list?

13      MR. LABBE:  Well, I think it does present the reference

14  product sponsor.  It puts Amgen on the horn of a dilemma, in

15  some respects, because there have been cases in the Hatch/Waxman

16  context, where the brand company has been found to have listed

17  too many patents in the Orange Book.  And so, it's a

18  reasonableness standard.

19      Amgen is supposed to make a reason -- a determination

20  of what patents would reasonably be asserted based on the

21  information that's been provided.  It can't make --

22      THE COURT:  But isn't it the case, that -- because you

23  were talking about Congressional intent -- Congressional policy

24  -- didn't they want to get all of this stuff out in the air,

25  open?

17

1    You said this multiple times.

2    MR. LABBE:  Well, to us that's the reason that the --

3    that the information should be provided.  And this notion that

4    we were trying to cook up a dispute is not consistent with

5    Amgen's activities.

6    THE COURT:  Well, so, you know, I gave Mr. Meloro a

7    chance to say various theories.  I'm not so interested in that

8    theory, because, frankly, you know, having the right to sue

9    under 2(A) doesn't strike me as something that a rational

10    company would say, yeah, well that's something we would like to

11    work towards.

12    But I do -- but I am wondering when -- I am just

13    wondering why, to the extent that everybody agrees part of goal

14    here was to get things resolved, why a company like Amgen

15    wouldn't be a reference sponsor, let's say, wouldn't be

16    aggressive in saying, here's all the patents that we have that

17    might cover this, and which then gives you the right to find out

18    more stuff, and to make a better choice about which things to go

19    forward on, right?

20    MR. LABBE:  Well, a listing of the patents doesn't give

21    Amgen a right to find out more information.  It would find out

22    their contentions, but it wouldn't require them to produce the

23    information.

24    The production requirement is set forth in 2(A), and

25    then Amgen is to make a determination, a reasonable

18

1    determination, not an uninformed determination.

2    Under what you're putting forth, your Honor, it would

3    mean that Amgen would never be able to assess the information

4    for itself.

5    Hospira could simply say, well, we don't infringe those

6    patents for these reasons, and never have an opportunity  to

7    assess the underlying information.

8    What Congress intended is that the underlying

9    information would be available to the reference product sponsor

10    to evaluate.  And let's keep in mind that the -- when we're

11    talking about Congressional intent, and Rule 26 -- keep in mind

12    we have Congressional intent, and we also have the Federal

13    Circuit's decision in Amgen v. Sandoz, which forecloses the

14    availability of -- at least as it stands right now, as the Court

15    ruled -- we couldn't bring a private cause of action.  We

16    couldn't do anything else to get the information, but to bring

17    an infringement suit, and seek the information in discovery.

18    And the Federal Circuit felt that that was a sufficient

19    way of addressing the issue.

20    THE COURT:  But the information in Amgen v. Sandoz, the

21    Federal Circuit was talking about was actually, clearly,

22    relevant to the claims that have been made, right?

23    MR. LABBE:  It was not.  It was not.

24    The only patent that had been asserted was a method of

25    treatment patent.  And, nevertheless, Sandoz produced its entire

19

1    BLA, and also produced additional manufacturing information.

2    The point of that really is that the Court in Amgen v.

3    Sandoz, the Federal Circuit relied on that fact.  The fact that

4    the information was then made available in discovery.  It relied

5    on that fact to --

6    THE COURT:  But the information that was made in

7    discovery, what was important to the Federal Circuit was not

8    that peripheral information had been made available, but the

9    core information relating to even though one patent, right?

10    MR. LABBE:  No.  It was all the information was made

11    available.  The entire aBLA was provided.

12    The important thing for the Federal Circuit, it

13    repeatedly referred to the information under 2(A) as required

14    information.

15    And from the opinion, the Court appears sympathetic to

16    the notion that the information needs to be provided, so that

17    infringement can't go undetected.

18    And, in that case, Amgen was only able to sue on a

19    method of treatment patent, and the Federal Circuit didn't

20    suggest that discovery should be limited to discovery that would

21    be relevant to a method of treatment patent.  In fact, that is

22    not what Sandoz did.

23    In its ruling, in its opinion, the Federal Circuit

24    really focused on that.  The information was then available in

25    discovery through an infringement suit, so that the required

20

1    information would not be withheld forever.  It would eventually

2    be provided.

3    And, in fact, subsequently, Amgen has amended its

4    Complaint that case to assert at least one additional patent

5    after the Federal Circuit ruling, and discovery continued to

6    progress in that case.

7    THE COURT:  So, Mr. Labbe, what kind of patent,

8    because, presumably, all the patents that Amgen has that could

9    conceivably cover any of this.  That's not a secret to somebody

10    like Hospira.

11    There are ways for them to know what patents, at least

12    according to the PTO, are assigned to you, correct?

13    MR. LABBE:  That's correct, your Honor.

14    THE COURT:  So what kind of patent do you have that

15    might cover the amino acids and the like in the cell culture

16    medium?

17    MR. LABBE:  Well, there's a number of cell culture

18    patents that Amgen owns, and they would require certain

19    ingredients.

20    One, for example, would require the addition of

21    caffeine to the cell culture medium that Amgen found that that

22    was a way to promote the production of the protein in these

23    cells, and a number of other patents of that nature that would

24    call for, including additional ingredients, and --

25    THE COURT:  And the description of the culture cell

21

1   culture medium that comes in the aBLA, isn't enough to tell you

2   whether or not any of your patents are reasonably implicated?

3        MR. LABBE:  Correct, your Honor, without knowing the

4   entire list of ingredients of the cell culture medium.

00:25:54   5        So, for example, one of -- this is under a Protective

6   Order, so I'm supposed to be careful about mentioning it, but --

7        THE COURT:  Yes, yes.  Pretend like everything you're

8   going to say here is going to be on the public record and speak

9   accordingly.

00:26:08   10        MR. LABBE:  Okay.  So, you know, one ingredient X.  It

11   is a -- it's a cell culture, it's a powder that is used in

12   making a cell culture medium, and it is probably a commercially

13   available powder, but the ingredient list is proprietary.

14        And we suspect that Hospira has the complete ingredient

00:26:28   15   list and that they should provide it to us.

16        And what exactly is in that cell culture powder,

17   product, we don't -- we don't know.  That information is not

18   provided.  There's some information about it provided in the

19   BLA, but it's not a complete ingredient that's provided in the

00:26:44   20   BLA.

21        So we don't know with certainty whether there are

22   additional patents of Amgen that are implicated.  Maybe there

23   aren't.  I can't say that there are, but we don't know.  We

24   weren't able to form a belief one way or the other.

00:26:58   25        THE COURT:  As a matter of curiosity, if you got the --

22

1   if you got what you were seeking from them, and you said, aha,

2   we have a couple of cell culture patents that cover this

3   exactly, would that mean that you would be moving to amend the

4   Complaint here, or do you have to go to through some kind of

00:27:22   5   other dance under the BPCIA, or what would happen next?

6        MR. LABBE:  We would seek leave to amend, the

7   Complaint, your Honor.  I don't think it would call for any

8   other process under the dance at this point, because this is

9   information that should have been provided previously.

00:27:36   10        I mean, we could take that under advisement, if there

11   were a process to go through, but I think it would just be a

12   matter of whether it gives us a Rule 11 basis to seek leave to

13   amend the Complaint at this point, if it was the purpose to go

14   through the process that Hospira should have given us the

00:27:54   15   information a year ago, and then we would have included it in

16   the process at that time.

17        THE COURT:  I understand your position.

18        Do you have a thought on that question?

19        MR. MELORO:  Yes.  A couple of thoughts.

00:28:02   20        First of all, a year ago Amgen had several choices, and

21   Hospira would submit duties if they thought they had patents

22   that could reasonably be asserted, even if they thought that

23   there was still information they would like to see concerning

24   those patents.  And they should have listed the patents on the

00:28:24   25   3(A) list.  That was their duty at that point.

23

1        Hospira also, in the correspondence, asked Amgen,

2   specifically, when they asked for this information.

3        Hospira said, no, we've complied with the statute.

4   We've given you aBLA, which describes the manufacturing process

00:28:42   5   for the product.  There is nothing more required.

6        But if there is something that you think you need to

7   see to evaluate a specific patent, please let us know, so we can

8   evaluate that.

9        And Amgen never responded to that.  They never said,

00:29:00   10   well, gee, here's something that we think might be implicated,

11   but we just don't without knowing the ingredients of component

12   X.

13        That's why we want the information.  They stayed

14   silent, and, presumably, we're fishing.  I don't know.  Maybe

00:29:16   15   they were sandbagging, but they just never responded to that.

16        If Amgen were in a position where it got the

17   information it's seeking now, and then sought leave to amend,

18   Hospira would certainly oppose such a motion, and would move to

19   dismiss such a claim on the grounds that those patent or patents

00:29:40   20   should have been on the 3(A) list, and Amgen is barred by

21   statute from asserting patents that were not on their 3(A) list.

22        THE COURT:  Okay.  Even though -- and I can't remember,

23   maybe I'm confusing this with something else -- if somewhere

24   down the road, let's assume in this particular case that we have

00:30:02   25   right here, right now, ends up unfavorably to Amgen.  And

24

1   somewhere down the road, you get whatever approvals you need --

2   well, obviously, not from me, but from somebody else, and you

3   start selling your biologic -- they can then sue you for

4   infringement upon some other theory that they haven't advanced

00:30:28   5   here, right?

6        MR. MELORO:  I don't believe Amgen can sue on patents

7   that should have been on their 3(A) list.

8        THE COURT:  Is that -- or is it only patents that come

9   in -- that they get after?

00:30:42   10        MR. MELORO:  If they have patents that are after

11   invented, so to speak, or acquired, then we could be in a

12   different situation.  But I don't -- I don't get the sense that

13   that's what we're talking about.

14        THE COURT:  Well, I mean, that not what we're talking

00:30:58   15   about right now, but I thought there was just some second round

16   of --

17        MR. LABBE:  Well, your Honor, the question raises a

18   number of different issues.  But just to focus on the should

19   have been included point.

00:31:08   20        I think -- and I'll try to limit my answer to that --

21   in that to the extent that Mr. Meloro is referring to Section

22   271(E)(6)(c), to the extent that that provision of the Patent

23   Act creates a bar of any kind, it only creates a bar for patents

24   that Amgen should have listed on its 3(A) list.

00:31:26   25        And it can't be said that Amgen should have listed

25

1   patents for which it lacked sufficient information to have a

2   reasonable belief that Hospira infringed.

3         The process that Mr. Meloro is describing --

4         THE COURT:  But, I mean, presumably, that would be

00:31:40  5   something that would be a question of fact to be figured out at

6   some later time, right?

7         MR. LABBE:  I agree with that, your Honor, that it

8   could be an issue to be decided later, but it's just not that

9   it's entirely foreclosed.  It's a question of whether it's a

00:31:54  10   patent that should have been included.

11         And we can't -- Amgen couldn't have included a patent

12   for which it lacked information.

13         And Mr. Meloro was not entirely right earlier in saying

14   that we didn't tell them why we wanted the information.  We did

00:32:06  15   say in our correspondence that Amgen owned cell culture patents,

16   and that was the reason that we were seeking the information.

17         It's not that Amgen has to identify the patents, and

18   then they tell us whether they infringe.  They have to give us

19   the manufacturing information so that Amgen can then assess it.

00:32:22  20   That's the process that's set forth in the BPCIA.

21         It's true that we didn't follow the process that Mr.

22   Meloro set forth, but that's not the process of the BPCIA.

23   That's a process that Hospira proposed and doesn't comport with

24   the process set forth in the statute where they give us, Amgen,

00:32:40  25   the information to assess and make a determination based on a

26

1   reasonableness standard of which patents it should list on its

2   3(A) list.

3         MR. MELORO:  May I respond, your Honor?

4         THE COURT:  Yes.

00:32:50  5         MR. MELORO:  In essence, I think what Amgen's position

6   comes down to is a back-door private right of action on what

7   they perceive to be a violation of Section (2)(A).  Hospira

8   complied with Section (2)(A).

9         Amgen is saying now they believe that Hospira didn't

00:33:08  10   comply with Section (2)(A) as to these four components.  They

11   have no 2(A) cause of action, but that's essentially the

12   gravamen of what they're trying to do under the rubric Rule 26.

13         THE COURT:  Okay.  And so, just to make sure that I

14   know what I'm ruling on here, if I think of what I'm ruling on

00:33:30  15   here is a list of ingredients for the four components in the

16   cell culture medium or some variation of that.

17         That's what you're looking for, Mr. Labbe?

18         MR. LABBE:  Yes, your Honor.  It's most succinctly

19   stated in our Interrogatory No. 1.

00:33:44  20         THE COURT:  Well, if you're comfortable with that --

21         MR. LABBE:  Yes.

22         THE COURT:  -- I don't need to --

23         MR. LABBE:  Yes.

24         THE COURT:  And do you agree too if that's what it

00:33:50  25   says?

27

1         MR. MELORO:  I'm comfortable that we think we know what

2   he is asking for.

3         THE COURT:  All right.

4         What I'm going to do is this.

00:34:00  5         I'm going to say that within two weeks, on the basis of

6   Claim 7 being asserted, it seems to me that it is relevant, it

7   seems to me it's proportionate, so on the narrow ground you need

8   to provide that information.

9         I'm going to take a break when we get through with the

00:34:24  10   FDA, and go back and look at Amgen v. Sandoz, since I looked at

11   it before, but to see -- because I'm inclined to give you an

12   alternate ruling one way or the other on the broader ground,

13   too, so that you can make whatever decisions are appropriate,

14   okay?

00:34:46  15         MR. MELORO:  Thank you, your Honor.

16         MR. LABBE:  Okay, your Honor.  Thank you.

17         THE COURT:  All right.

18         So, the FDA correspondence.

19         And so, here, as I understand it, Amgen's position is

00:35:06  20   Hospira should give you every single piece of paper of any kind

21   between them and the FDA relating to any aspects of these

22   biologics?

23         MR. LABBE:  I think that's right, your Honor, with

24   respect to the product that is the subject of their aBLA.

00:35:32  25         THE COURT:  All right.

28

1         And Hospira has responded, we will provide you any FDA

2   correspondence back and forth that relates to any --

3   essentially, to anything that's at issue, because of the

4   assertion of the patents against the biologic product.

00:35:56  5         Is that -- does that accurately sum up what your two

6   positions are?

7         MR. LABBE:  More or less.  I think their position is

8   even narrower, in my view, and that it's not just relevant to

9   the patent -- the patent lawsuit -- but it's relevant to the

00:36:06  10   specific claims of the patent is their position.

11         THE COURT:  Okay.

12         MR. LABBE:  In other words, it's our view that it's

13   relevant to the patent infringement suit.  And it's their view

14   that it's not relevant to the specific claims, and, therefore,

00:36:20  15   not relevant.

16         THE COURT:  Okay.  I didn't see that in their letter.

17         Mr. Meloro, what's your position?

18         MR. MELORO:  Our position is that we will provide

19   anything in the correspondence that's relevant to the patent

00:36:32  20   infringement claims in the case.

21         THE COURT:  So, the patent infringement claims, that's

22   ...

23         MR. MELORO:  The subject matter of the patents,

24   essentially.

00:36:52  25         So one patent relates to cells.  The other patent

29

1   relates to what are called isoforms.

2   THE COURT: Okay. That's helpful.

3   And so, why is it that you should get every single

4   piece of paper about unrelated aspects of the biologics? Is it,

00:37:14  5   essentially, as I think you said, so you'll know when they're

6   ready to launch?

7   MR. LABBE: That is one reason, your Honor. That's not

8   a improper reason. Hospira suggested that's some improper

9   reason.

00:37:22  10   There is a Protective Order in this case, and only

11   limited people at Amgen would know the information. It's a

12   proper purpose to know what the timing of the lawsuit needs to

13   be.

14   There's other reasons.

00:37:32  15   We know that they received what's called a complete

16   response letter from the FDA, and that they have to make an

17   additional submission, which they're expected to make some time

18   in the first half this year based on public information.

19   We don't know what will be in there. There may be

00:37:44  20   amendments to the BLA. There may be changes to the

21   manufacturing process.

22   THE COURT: Well, to the extent that they change the

23   process, and that's relevant to this lawsuit, they're going to

24   be, for sure, in their obligation to advise you, right? That's

00:38:00  25   a duty to supplement kind of thing, right?

30

1   MR. LABBE: Yes, but we think the duty to supplement

2   goes beyond that in this case. And there could be information

3   that could implicate additional patents. It could implicate the

4   timing of the case.

00:38:12  5   And we mentioned that this information, in our view, is

6   routinely provided in Hatch-Waxman cases, and we say that only

7   because for the same reasons it's relevant in those cases, it's

8   relevant here, it's relevant regarding what types of rejections,

9   what type of information they're receiving from the FDA. All of

00:38:28  10   that is potentially relevant. It could be relevant to a

11   potential defense in the case.

12   We -- they haven't answered the Complaint yet, but we

13   expect them to assert a clinical trial exemption. There be

14   could information about the manufacture of their lots of the

00:38:42  15   products.

16   THE COURT: To the extent they assert particular

17   defenses, you know, I think attributing to Mr. Meloro that right

18   now he's just -- right now the only thing on the table is your

19   infringement contentions. If they expand what is at issue here,

00:39:04  20   presumably that expands what -- things that he might have to

21   provide, if there is a discussion about experimental use, or

22   whatever it was you said.

23   And you say it's standard in Hatch-Waxman to produce

24   FDA correspondence, and I would say based on discovery disputes,

00:39:28  25   that it's not certainly just accepted that a hundred percent of

31

1   FDA correspondence gets produced. And, if so, I don't know why

2   I'm having so many discovery disputes over it.

3   The other thing is, even the discovery disputes I have,

4   it strikes me that, in fact, the norm, as I would define it -- I

00:39:50  5   will ask my Independent experts here in a minute -- the norm, I

6   would define it is, yes, I think it is routine that some FDA

7   correspondence gets provided back and forth, but I think it's

8   not routine that it is a hundred percent.

9   But, in any event, Ms. Noreika or Mr. Gattuso, do you

00:40:10  10   have any input on what the norm is?

11   MS. NOREIKA: In my experience, most of the FDA

12   correspondence is provided, and there is not usually disputes.

13   Disputes usually come up when you have situations where there's

14   a question as to whether it's going to effect the timing of

00:40:26  15   case, or whether they're going to be changes to the product that

16   would impact, you know, the infringement allegations, or

17   something like that.

18   I'm not sure what was brought to you, your Honor, but

19   in my cases, it's usually just provided, and there is not much

00:40:40  20   fight about it.

21   MR. GATTUSO: Judge, I think it's not always all. It's

22   most. And you do see it more when there is a change of

23   manufacturing process, or things like that, which will alter

24   the posture of the case.

00:40:54  25   THE COURT: All right.

32

1   THE COURT: All right.

2   So what sort of things do you imagine happening, Mr.

3   Meloro? What kind of correspondence do you imagine not

4   producing?

00:41:14  5   MR. MELORO: Correspondence that is unrelated to the

6   technical aspects of the product or the manufacturing process

7   that have bearing on the patents.

8   So, if there were, for example, routine correspondence

9   that indicated the progress of the application through the FDA,

00:41:36  10   but had no substantive discussion of the product or the

11   manufacturing process.

12   We're dealing with two expired patents. This is very

13   different from a Hatch-Waxman case where the patents are

14   enforced. There's usually a 30-month stay.

00:41:54  15   THE COURT: Well, when you say two expired patents,

16   explain that.

17   MR. MELORO: Both of the patents-in-suit are expired in

18   this case, and there is no 30-month stay.

19   So the usual concepts of expiration of the stay, and a

00:42:10  20   potential at-risk launch, and the things that happened routinely

21   in Hatch/Waxman cases are not at issue here.

22   THE COURT: Wait. Let me go back.

23   How can expired patents be asserted against you?

24   MR. LABBE: We can assert expired patents, your Honor,

00:42:26  25   based on previous acts of infringement. And we're seeking

33

1  damages based on earlier acts of infringement prior to the

2  expiration of the patents.

3  THE COURT:  But if they -- if they get permission, or

4  whatever it is they need to launch their biologic right now,

00:42:44  5  these two patents couldn't stop them?

6  MR. LABBE:  There's a possibility of some degree of

7  injunctive relief based on prior infringement in terms of

8  product that has been manufactured.  Based -- if the product was

9  manufactured and infringed under the patent, there's a

00:43:00  10  possibility of injunctive relief to some extent, but it wouldn't

11  -- it wouldn't prevent them forever, that's correct, your Honor.

12  We also --

13  THE COURT:  Let me just go back.

14  When did the second of these two expire?

00:43:10  15  MR. LABBE:  The second of two expired in January of

16  this year.

17  THE COURT:  How long, typically, does it take to

18  culture cells and grow them?  I mean, is that a long-drawn out

19  process or is that something that happens every 24 hours?

00:43:30  20  MR. LABBE:  I don't know how long it would take from

21  start to finish to make a batch, your Honor.  But I think since

22  January they probably could have manufactured a batch of the

23  product, if that's what you're asking?

24  THE COURT:  So how would back and forth with the FDA

00:43:50  25  effect -- so we're not, necessarily, talking about FDA

34

1  correspondence going forward.  We're talking more about FDA

2  correspondence that already occurred or, because I'm trying to

3  wonder how -- like if they right now we want to change the way

4  we manufacture things, maybe that -- I don't know whether that

00:44:14  5  creates some separate duty to do something, but in relation to

6  this suit, why do you care?

7  MR. LABBE:  Well, we're talking about both, really.

8  They could amend the Complaint -- they could amend

9  their BLA, rather, in a way that would implicate other Amgen

00:44:30  10  patents, and we don't -- we would be completely in the dark

11  about that.

12  THE COURT:  Okay.  But that doesn't seem to me like

13  this lawsuit is really about other Amgen patents, right, it's

14  about the two you asserted?

00:44:42  15  MR. LABBE:  It is about the two that we have asserted,

16  and that's based on the information that has been provided to us

17  to date.

18  If they were to make a change to their BLA that would

19  implicate other patents, Amgen should know about those patents

00:44:56  20  as well.  It should be provided as part of discovery.

21  THE COURT:  And so, FDA correspondence you want, I take

22  it's actually kind of a going-forward basis?  I mean --

23  MR. LABBE:  Correct, your Honor.  We would seek the

24  FDA correspondence on a going-forward basis for the reasons I've

00:45:16  25  stated.  For the -- there was a timing information --

35

1  THE COURT:  Mr. Labbe, is that actually what's in

2  dispute, not historical FDA correspondence, but stuff that has

3  yet to occur?

4  MR. LABBE:  Well, both items are in dispute.  The only

00:45:30  5  thing that we received from them is the BLA that they produced

6  last February a year ago.  Since February they haven't produced

7  any other FDA information.

8  THE COURT:  And so, this FDA response letter that you

9  seem to be quite certain that they have received, and in which

00:45:46  10  they have some duty to respond to, would that actually -- would

11  that actually be -- I guess that could be relevant to your

12  patent infringement, because it, perhaps, talks about something

13  they were doing before your patents expired?

14  MR. LABBE:  Correct, your Honor.  It could be, yes.

00:46:12  15  We don't know what was in the complete response letter.  We

16  don't know if they were -- if they were required to change their

17  manufacturing process.  Then, perhaps, nothing that they had

18  already manufactured at the time the patents expired, would even

19  be relevant any more, but we don't -- we don't know that.  They

00:46:26  20  haven't asserted that to us, but we don't have a way to even

21  evaluate that.

22  THE COURT:  All right.

23  And, Mr. Meloro, if the FDA correspondence, I guess if

24  it talks about something you did during the -- or, in

00:46:40  25  particular, this response letter -- and I'm not asking, because

36

1  I'm not entirely sure whether -- you don't even have to admit

2  there is a response letter -- but let's assume, hypothetically,

3  you got a response letter.

4  If there was something in it that talked about whatever

00:47:00  5  you were doing directly either indirectly before the patents

6  expired, you would produce that, right?

7  MR. MELORO:  That's correct, your Honor.  If it related

8  to the subject matter of these patents, we would produce the

9  information.

00:47:12  10  We haven't refused -- we did receive a letter from the

11  FDA, that's been publicly-acknowledged by the company, and we

12  haven't refused to produce that letter.

13  The reason we're before your Honor today is the line

14  that we've drawn as to how we will decide what to produce from

00:47:28  15  the FDA correspondence is what Amgen is unhappy about.

16  THE COURT:  Okay.  I think the usual balance of things

17  here is pretty significantly in favor of Hospira here, because

18  unlike the Hatch/Waxman cases that I see where there are

19  legitimate timing issues that impact all aspects of the

00:48:06  20  litigation, they don't really seem to be at issue here, because

21  the two patents that are asserted, as I understand it, can't

22  effectively -- you know, I can't see them as actually having

23  much to do with whether or not Hospira can start -- or can

24  launch its product, and market it, or whatever.

00:48:36  25  So I don't think the -- and so, even though I

37

1  appreciate the highest degrees of confidentiality and such, it
2  seems to me that before you even order, or before you produce
3  that, even though I'm quite confident everyone will live up to
4  the Protective Order, that does seem to me to be very important
00:49:02  5  information to Hospira.
6  And so, it seems to have, essentially, no relevance to
7  the patents that are asserted. I think the line that Hospira
8  has drawn is the right line.
9  MR. LABBE: Can I just add one thing, your Honor?
00:49:16 10  I mean, we do so on the pending 8(A) issue, and I know
11  that's subject to a Motion to Dismiss right now, but were the
12  Court to deny that Motion to Dismiss, the issue there is whether
13  Hospira is giving the appropriate 180-day notice before it
14  launches its product.
00:49:32 15  And there the timing of the information would be
16  particularly relevant, because we're in the dark right now as to
17  when they may get approval. We don't know if they've already
18  filed their responses, a complete response letter or not, or
19  when -- we just don't now anything other than what they have
00:49:46 20  said publicly back in the fall.
21  So for that issue, we think it would be particularly
22  relevant, and I haven't focused on that, because it's subject to
23  the Motion to Dismiss.
24  I would just state that for the record.
00:49:56 25  THE COURT: Okay. And, I'm sorry, Mr. Labbe, just -- I

38

1  don't mind you mentioning that just a little more, because it's
2  not in the forefront of my mind.
3  MR. LABBE: Yes. So the 8(A) issue, as I was referring
4  to it, your Honor is, we have asserted a claim in the case that
00:50:14  5  is subject to the Motion to Dismiss, saying that Hospira has
6  violated the BPCIA by refusing to give 180-days notice prior to
7  its commercial marketing.
8  Under the Amgen v. Sandoz case, such a notice can only
9  be given after Hospira receives approval from the FDA. Under
00:50:34 10  the Amgen v. Sandoz case, they're then required to wait a
11  hundred and eighty days after approval before launching the
12  product.
13  And so, that's an issue that's been raised.
14  THE COURT: But you would -- if they get the approval,
00:50:54 15  do you learn that they've gotten the approval?
16  MR. LABBE: I don't know. It wouldn't be public
17  information. They would, perhaps, announce that, but we
18  wouldn't necessarily know that they've gotten approval. They
19  might just launch.
00:51:08 20  Now, their position is that they don't have to give us
21  the notice. And so, if they were able go forward with that
22  position, we wouldn't know, and we wouldn't have an opportunity
23  to seek an injunction to prevent the launch without their
24  waiting the statutory 180 days, but I don't know of any way that
00:51:26 25  Amgen would know, unless they made a press release about it.

39

1  THE COURT: Okay. Do --
2  MR. LABBE: It may, at some point, become a part of the
3  FDA website. You wouldn't know when it's about to happen to be
4  able to come to court and seek an injunction.
00:51:44  5  MR. MELORO: I'm not a FDA expert, but I do believe
6  that the FDA posts approvals very promptly after they are
7  issued.
8  THE COURT: So, in other words, to the extent that
9  there is a concern about the timing of things, if the FDA gave
00:52:04 10  you approval, you're saying it would be public knowledge, in
11  your opinion?
12  MR. MELORO: That's my understanding.
13  THE COURT: All right. Okay.
14  Well, so, I'm going to stick with what I said about the
00:52:16 15  FDA.
16  Let me just go off and take another look at Amgen v.
17  Sandoz, and I will be back.
18  (A recess was taken at this time.)
19  (The proceedings continued after the recess as
01:14:26 20  follows:)
21  THE COURT: Well, thank you for your patience.
22  So on the broader asserted basis for discovery, I'm
23  going to deny plaintiffs' request.
24  I don't think the Amgen v. Sandoz Federal Circuit case
01:14:52 25  is really on point for -- not only -- it would be controlling,

40

1  obviously, if it were on point, but it's not on point. I don't
2  think that really impacts this at all.
3  And, I think, looking for the cell culture medium so
4  you can consider about asserting other patents, it's, basically,
01:15:20  5  what in the pre-amendment, you know, before December, what we
6  just called the fishing expedition, they're even less favored
7  after the amendments than they were before.
8  So, to the extent that you're interested in assessing
9  what other patents you might have had, I don't think this is the
01:15:46 10  way to do it.
11  So I'm going to, on the broader grounds, deny it, but
12  that will only come into play if the narrow grounds became moot
13  for some reason, all right?
14  MR. MELORO: Thank you, your Honor.
01:16:00 15  Just for clarity, on the narrower ground, the Order at
16  this point is that the information be produced in two weeks, if
17  the Claim 7 infringement issue is still in play?
18  THE COURT: Right. It seems to me to be relevant to
19  that.
01:16:18 20  MR. MELORO: Thank you, your Honor.
21  MR. LABBE: I understand the Court's ruling. It puts
22  us in a somewhat difficult position.
23  If we're getting the discovery, it doesn't make any
24  difference, but because we've dropped 2(A) claim, really, in
01:16:32 25  reliance on the Amgen v. Sandoz decision, I think that's a issue

41

1    that we may -- Amgen may have reevaluate.

2          We'll take that under consideration as to whether there

3    are any additional --

4          THE COURT:  Okay.  Let me just say, when we were taking

01:16:50    5    the recess, my law clerk was pointing out, I was asking some of

6    these questions that I was asking today at the oral argument.

7          You know, after we have oral argument, usually we

8    decide how we're going to decide it, but it takes time to write

9    it up.

01:17:14    10          And my law clerk reminded me that among other things,

11    we weren't in a hurry to write that up, because we thought it --

12    the overall oral argument topics might be effected by the appeal

13    from this Florida case in the Federal Circuit, which I think is

14    on 8(A)?

01:17:34    15          MR. LABBE:  Correct, your Honor.

16          THE COURT:  Apparently, I was -- well, you obviously

17    know this -- it was argued six weeks ago or something?

18          MR. LABBE:  It was argued.  That's right.  That's about

19    right, your Honor.

01:17:48    20          THE COURT:  So we're probably not going to decide that

21    until -- we would appreciate getting the benefit of whatever the

22    Federal Circuit might have to say about that.  Maybe it will be

23    helpful, maybe it won't.

24          In terms of -- and so, is it -- is it the case, though,

01:18:10    25    now this case is just is kind of just in more or less a hiatus,

42

1    because you are waiting for me to decide this thing, you said

2    you haven't answered the Complaint?

3          MR. MELORO:  With respect to a formal answer to the

4    Complaint, I think it was the pending motion, but we do have a

01:18:26    5    schedule in place, and the parties will move through fact

6    discovery on the two expired patents, so we're not paused in

7    that sense.

8          THE COURT:  Okay.  All right.

9          Thank you.  That's another thing I couldn't remember.

01:18:40    10    All right.

11          Normally, the transcript here serves as the Order of

12    the Court on these things.

13          If you need me any further, you know how to contact me.

14          MR. MELORO:  Thank you, your Honor.

01:18:54    15          MR. LABBE:  Thank you, your Honor.

16          THE COURT:  Thank you very much.

17          (The proceedings adjourned at 1:18 o'clock p.m.)

18                          * * * * *

19

20

21

22

23

24

25

**'**

**'349** [1] - 13:3

# 1

**1** [2] - 6:21, 26:19
**11** [1] - 22:12
**15-839** [1] - 3:7
**15-839-RGA** [1] - 1:4
**180** [1] - 38:24
**180-day** [1] - 37:13
**180-days** [1] - 38:6
**1:18** [1] - 42:17
**1:32** [2] - 1:12, 3:3

# 2

**2** [1] - 6:21
**2(A** [9] - 10:12, 14:19,
14:21, 15:16, 17:9,
17:24, 19:13, 26:11,
40:24
**2(A)** [3] - 10:6, 14:24,
15:7
**2(a)** [1] - 10:9
**2)(A** [1] - 26:10
**2)(a** [1] - 7:18
**2)(A)** [2] - 26:7, 26:8
**2016** [1] - 1:8
**24** [1] - 33:19
**26** [4] - 11:4, 13:11,
18:11, 26:12
**271(E** [1] - 7:24
**271(E)(6)(c** [1] - 24:22

# 3

**3** [1] - 6:21
**3(A** [9] - 14:14, 15:22,
16:11, 22:25, 23:20,
23:21, 24:7, 24:24,
26:2
**30-month** [2] - 32:14,
32:18

# 4

**4** [2] - 1:8, 6:21

# 5

**5** [1] - 6:21

# 6

**6** [1] - 6:21

# 7

**7** [14] - 6:11, 6:16,
6:18, 11:8, 12:5,
12:6, 12:10, 12:12,
12:17, 12:24, 13:5,
13:7, 27:6, 40:17
**700,000** [1] - 9:12

# 8

**8(A** [4] - 10:10, 37:10,
38:3, 41:14

# 9

**9th** [1] - 5:1

# A

**abbreviated** [1] - 10:3
**aBLA** [9] - 7:14, 8:12,
9:11, 9:21, 14:1,
19:11, 21:1, 23:4,
27:24
**able** [9] - 5:11, 9:8,
12:1, 16:5, 18:3,
19:18, 21:24, 38:21,
39:4
**accepted** [1] - 30:25
**according** [2] - 6:20,
20:12
**accordingly** [1] - 21:9
**accurately** [1] - 28:5
**acids** [6] - 5:19, 5:20,
5:24, 20:15
**acknowledged** [1] -
36:11
**acquired** [1] - 24:11
**Act** [1] - 24:23
**action** [9] - 10:6, 10:9,
10:11, 14:24, 15:11,
15:16, 18:15, 26:6,
26:11
**Action** [1] - 3:7
**activities** [1] - 17:5
**acts** [2] - 32:25, 33:1
**actual** [1] - 13:19
**add** [2] - 16:9, 37:9
**addition** [1] - 20:20
**additional** [9] - 6:4,
6:6, 19:1, 20:4,
20:24, 21:22, 29:17,
30:3, 41:3
**addressing** [1] - 18:19
**adjourned** [1] - 42:17
**admit** [1] - 36:1
**advance** [1] - 7:7
**advanced** [1] - 24:4
**advantage** [1] - 10:3

**advise** [1] - 29:24
**advisement** [1] -
22:10
**afternoon** [8] - 3:5,
3:8, 3:9, 3:13, 3:14,
4:1, 4:3, 4:4
**aggressive** [1] - 17:16
**ago** [8] - 8:24, 15:14,
22:15, 22:20, 35:6,
41:17
**agree** [2] - 25:7, 26:24
**agrees** [1] - 17:13
**aha** [1] - 22:1
**air** [1] - 16:24
**al** [1] - 1:4
**allegation** [1] - 11:24
**allegations** [1] - 31:16
**allow** [1] - 14:13
**allowed** [1] - 14:13
**alter** [1] - 31:23
**alternate** [1] - 27:12
**amend** [6] - 22:3,
22:6, 22:13, 23:17,
34:8
**Amended** [1] - 15:5
**amended** [1] - 20:3
**amendment** [1] - 40:5
**amendments** [2] -
29:20, 40:7
**Amgen** [67] - 3:7,
4:14, 6:5, 7:6, 8:6,
9:1, 9:5, 9:6, 9:8,
10:1, 10:5, 10:11,
10:22, 11:3, 11:25,
12:9, 13:1, 13:9,
13:24, 13:25, 14:12,
14:22, 15:8, 16:10,
16:14, 16:19, 17:14,
17:21, 17:25, 18:3,
18:13, 18:20, 19:2,
19:18, 20:3, 20:8,
20:18, 20:21, 21:22,
22:20, 23:1, 23:9,
23:16, 23:20, 23:25,
24:6, 24:24, 24:25,
25:11, 25:15, 25:17,
25:19, 25:24, 26:9,
27:10, 29:11, 34:9,
34:13, 34:19, 36:15,
38:8, 38:10, 38:25,
39:16, 39:24, 40:25,
41:1
**AMGEN** [1] - 1:4
**Amgen's** [4] - 15:15,
17:5, 26:5, 27:19
**amino** [6] - 5:19, 5:20,
5:24, 20:15
**ANDREWS** [1] - 1:17
**announce** [1] - 38:17
**answer** [2] - 24:20,

42:3
**answered** [2] - 30:12,
42:2
**appeal** [1] - 41:12
**APPEARANCES** [1] -
1:21
**apple** [1] - 15:20
**applicant** [2] - 8:4,
10:15
**application** [3] - 7:19,
8:16, 32:9
**appreciate** [3] - 13:14,
37:1, 41:21
**approaches** [1] -
16:11
**appropriate** [2] -
27:13, 37:13
**approval** [7] - 37:17,
38:9, 38:11, 38:14,
38:15, 38:18, 39:10
**approvals** [2] - 24:1,
39:6
**argue** [1] - 11:4
**argued** [3] - 3:18,
41:17, 41:18
**argument** [14] - 7:2,
7:3, 7:4, 11:3, 11:6,
11:7, 11:8, 13:13,
13:14, 14:18, 14:20,
41:6, 41:7, 41:12
**ARSHT** [1] - 1:23
**aspects** [4] - 27:21,
29:4, 32:6, 36:19
**assert** [11] - 7:14,
7:24, 8:2, 14:12,
14:13, 16:6, 20:4,
30:13, 30:16, 32:24
**asserted** [15] - 6:9,
12:6, 14:4, 16:20,
18:24, 22:22, 27:6,
32:23, 34:14, 34:15,
35:20, 36:21, 37:7,
38:4, 39:22
**asserting** [3] - 15:21,
23:21, 40:4
**assertion** [1] - 28:4
**assess** [5] - 10:2,
18:3, 18:7, 25:19,
25:25
**assessing** [1] - 40:8
**assigned** [1] - 20:12
**assume** [2] - 23:24,
36:2
**at-risk** [1] - 32:20
**attempt** [1] - 11:4
**attributing** [1] - 30:17
**automatically** [1] -
15:23
**availability** [1] - 18:14
**available** [7] - 15:16,

18:9, 19:4, 19:8,
19:11, 19:24, 21:13

# B

**back-door** [1] - 26:6
**balance** [1] - 36:16
**banc** [2] - 15:4, 15:11
**bar** [2] - 24:23
**barred** [1] - 23:20
**based** [15] - 7:25, 8:2,
10:6, 10:9, 10:12,
12:24, 16:20, 25:25,
29:18, 30:24, 32:25,
33:1, 33:7, 33:8,
34:16
**basis** [5] - 22:12, 27:5,
34:22, 34:24, 39:22
**batch** [2] - 33:21,
33:22
**bearing** [1] - 32:7
**became** [1] - 40:12
**become** [1] - 39:2
**BEFORE** [1] - 1:17
**beforehand** [1] - 15:3
**beginning** [1] - 14:22
**belief** [2] - 21:24, 25:2
**benefit** [1] - 41:21
**better** [1] - 17:18
**between** [4] - 7:23,
15:5, 15:14, 27:21
**beyond** [1] - 30:2
**biologic** [5] - 4:18,
5:5, 24:3, 28:4, 33:4
**biological** [2] - 7:21,
8:15
**biologics** [2] - 27:22,
29:4
**biology** [1] - 5:1
**bite** [1] - 15:20
**BLA** [9] - 5:20, 9:23,
19:1, 21:19, 21:20,
29:20, 34:9, 34:18,
35:5
**blocks** [1] - 5:19
**Book** [1] - 16:17
**BORUN** [1] - 2:1
**BPCIA** [12] - 4:13, 7:6,
7:9, 7:23, 8:1, 8:25,
11:4, 13:10, 22:5,
25:20, 25:22, 38:6
**brand** [1] - 16:16
**break** [1] - 27:9
**briefly** [1] - 3:22
**bring** [6] - 10:9, 10:11,
14:21, 15:10, 18:15,
18:16
**broader** [8] - 6:13, 7:3,
7:4, 11:6, 13:10,
27:12, 39:22, 40:11

brought [2] - 7:6, 31:18
building [1] - 5:19
BY [4] - 1:24, 2:2, 2:6, 2:9

## C

CA [1] - 1:4
caffeine [1] - 20:21
care [1] - 34:6
careful [1] - 21:6
Case [2] - 3:17, 3:22
case [36] - 7:5, 7:6, 7:12, 10:18, 11:13, 11:24, 12:23, 13:4, 13:5, 13:7, 14:23, 14:25, 15:2, 15:8, 16:22, 19:18, 20:4, 20:6, 23:24, 28:20, 29:10, 30:2, 30:4, 30:11, 31:15, 31:24, 32:13, 32:18, 38:4, 38:8, 38:10, 39:24, 41:13, 41:24, 41:25
cases [6] - 16:15, 30:6, 30:7, 31:19, 32:21, 36:18
caused [1] - 15:6
cell [27] - 4:22, 4:25, 5:2, 5:3, 5:9, 5:12, 5:16, 5:22, 5:25, 6:12, 6:25, 9:14, 11:11, 11:17, 20:15, 20:17, 20:21, 20:25, 21:4, 21:11, 21:12, 21:16, 22:2, 25:15, 26:16, 40:3
cells [8] - 5:6, 5:10, 5:11, 6:20, 20:23, 28:25, 33:18
cert [1] - 15:9
certain [3] - 7:10, 20:18, 35:9
certainly [4] - 6:25, 13:2, 23:18, 30:25
certainty [1] - 21:21
chance [1] - 17:7
change [6] - 15:6, 29:22, 31:22, 34:3, 34:18, 35:16
changes [2] - 29:20, 31:15
Chicago [1] - 3:11
choice [1] - 17:18
choices [1] - 22:20
Circuit [14] - 10:14, 10:18, 15:4, 18:18, 18:21, 19:3, 19:7, 19:12, 19:19, 19:23,

20:5, 39:24, 41:13, 41:22
Circuit's [1] - 18:13
circumstances [1] - 15:6
circumvented [1] - 13:12
circumventing [1] - 13:16
Civil [1] - 3:7
Claim [14] - 6:11, 6:16, 6:18, 11:8, 12:5, 12:6, 12:10, 12:12, 12:17, 12:24, 13:5, 13:7, 27:6, 40:17
claim [8] - 7:1, 7:24, 11:10, 11:17, 14:4, 23:19, 38:4, 40:24
claimed [1] - 5:3
Claims [1] - 6:21
claims [6] - 6:3, 6:10, 18:22, 28:10, 28:14, 28:20, 28:21
clarity [1] - 40:15
clearly [3] - 12:1, 15:14, 18:21
clerk [2] - 41:5, 41:10
client [1] - 12:25
clinical [1] - 30:13
co [1] - 3:10
co-counsel [1] - 3:10
cohorts [1] - 9:12
comfortable [2] - 26:20, 27:1
commercial [2] - 5:10, 38:7
commercially [1] - 21:12
common [1] - 5:18
company [5] - 16:10, 16:16, 17:10, 17:14, 36:11
Complaint [12] - 14:23, 15:5, 15:11, 20:4, 22:4, 22:7, 22:13, 30:12, 34:8, 42:2, 42:4
complete [8] - 4:23, 5:21, 9:19, 21:14, 21:19, 29:15, 35:15, 37:18
completely [1] - 34:10
complied [2] - 23:3, 26:8
comply [1] - 26:10
component [1] - 23:11
components [12] - 4:22, 5:13, 5:16, 9:17, 9:18, 9:19, 11:14, 11:23, 12:13,

13:7, 26:10, 26:15
comport [1] - 25:23
composition [1] - 6:24
comprising [1] - 6:19
conceivable [1] - 13:3
conceivably [2] - 16:5, 20:9
concept [1] - 15:19
concepts [1] - 32:19
concern [3] - 10:14, 10:20, 39:9
concerning [1] - 22:23
conditions [4] - 6:12, 6:20, 6:22, 11:12
Conference [2] - 3:18, 3:23
confident [1] - 37:3
confidentiality [1] - 37:1
confusing [1] - 23:23
Congress [3] - 13:11, 13:17, 18:8
Congressional [4] - 16:23, 18:11, 18:12
conjure [1] - 14:17
conservative [1] - 16:11
consider [1] - 40:4
consideration [1] - 41:2
consistent [1] - 17:4
contact [1] - 42:13
contemplated [1] - 13:18
contention [1] - 12:11
contentions [6] - 12:1, 12:7, 13:3, 14:8, 17:22, 30:19
contest [3] - 12:9, 12:12, 12:16
context [1] - 16:16
continued [2] - 20:5, 39:19
controlling [1] - 39:25
cook [1] - 17:4
core [1] - 19:9
correct [11] - 5:4, 6:24, 9:1, 20:12, 20:13, 21:3, 33:11, 34:23, 35:14, 36:7, 41:15
correspondence [21] - 8:21, 15:13, 23:1, 25:15, 27:18, 28:2, 28:19, 30:24, 31:1, 31:7, 31:12, 32:3, 32:5, 32:8, 34:1, 34:2, 34:21, 34:24, 35:2, 35:23, 36:15
counsel [3] - 3:10,

11:6, 14:20
couple [2] - 22:2, 22:19
court [2] - 15:20, 39:4
COURT [86] - 1:1, 3:5, 3:12, 3:14, 3:20, 3:24, 4:4, 4:15, 4:25, 5:14, 5:24, 6:6, 6:15, 6:22, 7:2, 7:13, 8:7, 8:12, 8:17, 9:10, 10:25, 11:1, 11:15, 11:20, 12:4, 12:15, 13:13, 14:10, 14:25, 15:18, 15:24, 16:9, 16:22, 17:6, 18:20, 19:6, 20:7, 20:14, 20:25, 21:7, 21:25, 22:17, 23:22, 24:8, 24:14, 25:4, 26:4, 26:13, 26:20, 26:22, 26:24, 27:3, 27:17, 27:25, 28:11, 28:16, 28:21, 29:2, 29:22, 30:16, 31:25, 32:1, 32:15, 32:22, 33:3, 33:13, 33:17, 33:24, 34:12, 34:21, 35:1, 35:8, 35:22, 36:16, 37:25, 38:14, 39:1, 39:8, 39:13, 39:21, 40:18, 41:4, 41:16, 41:20, 42:8, 42:16
Court [10] - 2:20, 2:21, 3:18, 12:23, 15:3, 18:14, 19:2, 19:15, 37:12, 42:12
Court's [1] - 40:21
cover [4] - 17:17, 20:9, 20:15, 22:2
creates [3] - 24:23, 34:5
culture [28] - 4:22, 4:25, 5:9, 5:12, 5:16, 5:22, 5:25, 6:12, 6:17, 6:23, 6:25, 9:14, 11:11, 11:17, 20:15, 20:17, 20:21, 20:25, 21:1, 21:4, 21:11, 21:12, 21:16, 22:2, 25:15, 26:16, 33:18, 40:3
culturing [2] - 6:19, 11:11
curiosity [1] - 21:25

## D

damages [1] - 33:1
dance [3] - 15:22, 22:5, 22:8

dark [2] - 34:10, 37:16
date [1] - 34:17
days [2] - 38:11, 38:24
dealing [1] - 32:12
December [1] - 40:5
decide [5] - 36:14, 41:8, 41:20, 42:1
decided [3] - 14:25, 15:2, 25:8
decision [2] - 18:13, 40:25
decisions [1] - 27:13
defeated [1] - 13:24
defeating [1] - 13:22
Defendant [2] - 1:12, 2:5
defense [1] - 30:11
defenses [1] - 30:17
define [2] - 31:4, 31:6
degree [1] - 33:6
degrees [1] - 37:1
DELAWARE [1] - 1:2
denied [1] - 15:4
deny [2] - 37:12, 39:23, 40:11
describe [1] - 9:13
describes [3] - 7:20, 8:14, 23:4
describing [1] - 25:3
description [1] - 20:25
determination [5] - 16:19, 17:25, 18:1, 25:25
DIBBS [1] - 2:20
difference [3] - 12:22, 13:8, 40:24
different [4] - 10:10, 24:12, 24:18, 32:13
difficult [1] - 40:22
dilemma [1] - 16:14
directly [2] - 11:12, 36:5
Discovery [1] - 13:18
DISCOVERY [1] - 1:16
discovery [21] - 7:12, 10:8, 10:13, 10:20, 10:21, 10:22, 11:5, 18:17, 19:4, 19:7, 19:20, 19:25, 20:5, 30:24, 31:2, 31:3, 34:20, 39:22, 40:23, 42:6
discussion [6] - 12:8, 12:25, 13:1, 13:8, 30:21, 32:10
dismiss [1] - 23:19
Dismiss [6] - 3:18, 3:19, 37:11, 37:12, 37:23, 38:5
DISPUTE [1] - 1:16

**dispute** [3] - 17:4, 35:2, 35:4
**disputes** [5] - 7:7, 30:24, 31:2, 31:3, 31:12
**Disputes** [1] - 31:13
**distinction** [1] - 7:23
**District** [1] - 15:3
**DISTRICT** [3] - 1:1, 1:2, 1:18
**dodge** [1] - 12:21
**DOMINICK** [2] - 2:6
**door** [1] - 26:6
**down** [3] - 23:24, 24:1, 26:6
**drawn** [3] - 33:18, 36:14, 37:8
**drop** [1] - 15:6
**dropped** [1] - 40:24
**during** [5] - 8:20, 8:22, 10:8, 10:13, 35:24
**duties** [1] - 22:21
**duty** [5] - 22:25, 29:25, 30:1, 34:5, 35:10

**E**

**effect** [2] - 31:14, 33:25
**effected** [1] - 41:12
**effectively** [1] - 36:22
**effort** [1] - 7:6
**eighty** [1] - 38:11
**either** [1] - 36:5
**element** [1] - 6:16
**en** [2] - 15:4, 15:11
**end** [2] - 11:4, 13:4
**ends** [2] - 15:23, 23:25
**ENERIO** [1] - 2:5
**enforced** [1] - 32:14
**engaged** [1] - 12:8
**entire** [4] - 7:8, 18:25, 19:11, 21:4
**entirely** [3] - 25:9, 25:13, 36:1
**entitled** [1] - 9:6
**envisioned** [1] - 13:21
**erythropoietin** [1] - 6:19
**ESQ** [4] - 1:24, 2:2, 2:6, 2:9
**essence** [1] - 26:5
**essentially** [6] - 8:12, 26:11, 28:3, 28:24, 29:5, 37:6
**et** [1] - 1:4
**evaluate** [4] - 18:10, 23:7, 23:8, 35:21
**evaluating** [1] - 10:17
**event** [1] - 31:9

**eventually** [1] - 20:1
**exact** [1] - 11:21
**exactly** [3] - 4:8, 21:16, 22:3
**example** [6] - 5:14, 5:18, 5:21, 20:20, 21:5, 32:8
**exchange** [4] - 8:4, 8:21, 8:22, 10:24
**exemption** [1] - 30:13
**exhibits** [1] - 8:21
**exists** [1] - 5:3
**expand** [1] - 30:19
**expands** [1] - 30:20
**expect** [1] - 30:13
**expected** [1] - 29:17
**expedition** [2] - 4:21, 40:6
**experience** [1] - 31:11
**experimental** [1] - 30:21
**expert** [1] - 39:5
**experts** [1] - 31:5
**expiration** [2] - 32:19, 33:2
**expire** [1] - 33:14
**expired** [10] - 32:12, 32:15, 32:17, 32:23, 32:24, 33:15, 35:13, 35:18, 36:6, 42:6
**explain** [1] - 32:16
**expressed** [1] - 10:14
**extent** [10] - 7:5, 9:15, 17:13, 24:21, 24:22, 29:22, 30:16, 33:10, 39:8, 40:8

**F**

**face** [1] - 11:16
**fact** [13] - 9:24, 10:7, 10:15, 11:25, 13:24, 19:3, 19:5, 19:21, 20:3, 25:5, 31:4, 42:5
**fall** [2] - 6:25, 37:20
**falls** [1] - 11:3
**far** [1] - 6:9
**Farr** [1] - 4:2
**FARR** [1] - 2:8
**favor** [1] - 36:17
**favored** [1] - 40:6
**FDA** [28] - 27:10, 27:18, 27:21, 28:1, 29:16, 30:9, 30:24, 31:1, 31:6, 31:11, 32:9, 33:24, 33:25, 34:1, 34:21, 34:24, 35:2, 35:7, 35:8, 35:23, 36:11, 36:15,

38:9, 39:3, 39:5, 39:6, 39:9, 39:15
**February** [3] - 3:19, 35:6
**Federal** [15] - 10:14, 10:18, 15:4, 18:12, 18:18, 18:21, 19:3, 19:7, 19:12, 19:19, 19:23, 20:5, 39:24, 41:13, 41:22
**felt** [1] - 18:18
**fight** [1] - 31:20
**figured** [1] - 25:5
**filed** [1] - 37:18
**filing** [1] - 14:14
**finish** [1] - 33:21
**firm** [1] - 3:11
**first** [9] - 4:6, 4:9, 4:10, 8:21, 16:4, 16:7, 22:20, 29:18
**first-wave** [2] - 16:4, 16:7
**fishing** [3] - 4:20, 23:14, 40:6
**Florida** [1] - 41:13
**focus** [1] - 24:18
**focused** [2] - 19:24, 37:22
**follow** [2] - 10:4, 25:21
**follows** [2] - 3:4, 39:20
**FOR** [1] - 1:2
**foreclosed** [1] - 25:9
**forecloses** [1] - 18:13
**forefront** [1] - 38:2
**forever** [3] - 10:16, 20:1, 33:11
**form** [1] - 21:24
**formal** [1] - 42:3
**forth** [9] - 11:3, 17:24, 18:2, 25:20, 25:22, 25:24, 28:2, 31:7, 33:24
**forward** [7] - 16:1, 16:2, 17:19, 34:1, 34:22, 34:24, 38:21
**four** [11] - 4:17, 4:22, 9:17, 9:18, 9:19, 11:14, 11:23, 12:13, 13:6, 26:10, 26:15
**frankly** [1] - 17:8
**front** [2] - 8:10, 12:7

**G**

**GALLAGHER** [1] - 2:8
**Gattuso** [2] - 3:25, 31:9
**GATTUSO** [3] - 2:6, 4:1, 31:21
**gee** [1] - 23:10

**Gerstein** [1] - 3:11
**GERSTEIN** [1] - 2:1
**given** [4] - 13:25, 22:14, 23:4, 38:9
**goal** [1] - 17:13
**going-forward** [2] - 34:22, 34:24
**grade** [1] - 5:1
**gravamen** [1] - 26:12
**ground** [2] - 27:7, 27:12, 40:15
**grounds** [4] - 16:7, 23:19, 40:11, 40:12
**grow** [2] - 5:11, 33:18
**grown** [2] - 5:7, 5:10
**guess** [2] - 35:11, 35:23
**guessing** [1] - 14:15

**H**

**half** [1] - 29:18
**hand** [1] - 14:6
**hard** [1] - 12:25
**Hatch** [5] - 7:23, 7:24, 30:6, 30:23, 32:13
**Hatch-Waxman** [5] - 7:23, 7:24, 30:6, 30:23, 32:13
**Hatch/Waxman** [3] - 16:15, 32:21, 36:18
**haziest** [1] - 6:1
**heard** [2] - 3:21, 9:11
**helpful** [2] - 29:2, 41:23
**HEYMAN** [1] - 2:1
**hiatus** [1] - 41:25
**highest** [1] - 37:1
**historical** [1] - 35:2
**Honor** [38] - 3:9, 3:13, 4:1, 4:10, 5:4, 6:24, 7:4, 7:18, 9:15, 11:2, 18:2, 20:13, 21:3, 22:7, 24:17, 25:7, 26:3, 26:18, 27:15, 27:16, 27:23, 29:7, 31:18, 32:24, 33:11, 33:21, 34:23, 35:14, 36:7, 36:13, 37:9, 38:4, 40:14, 40:20, 41:15, 41:19, 42:14, 42:15
**honor** [1] - 4:3
**HONORABLE** [1] - 1:17
**horn** [1] - 16:14
**Hospira** [30] - 3:7, 4:8, 4:12, 8:22, 9:2, 14:1, 14:6, 14:8, 18:5, 20:10, 21:14, 22:14,

22:21, 23:1, 23:3, 23:18, 25:2, 25:23, 26:7, 26:9, 27:20, 28:1, 29:8, 36:17, 36:23, 37:5, 37:7, 37:13, 38:5, 38:9
**HOSPIRA** [1] - 1:10
**Hospira's** [2] - 7:7, 9:7
**hours** [1] - 33:19
**hundred** [3] - 30:25, 31:8, 38:11
**hundreds** [1] - 9:23
**hurry** [1] - 41:11
**hypothetically** [1] - 36:2

**I**

**idea** [1] - 16:1
**identified** [1] - 4:21
**identifies** [1] - 9:18
**identify** [1] - 25:17
**identifying** [1] - 11:10
**identities** [1] - 12:13
**identity** [2] - 11:13, 11:23
**imagine** [2] - 32:2, 32:3
**impact** [1] - 31:16, 36:19
**impacts** [1] - 40:2
**implicate** [4] - 30:3, 34:9, 34:19
**implicated** [4] - 7:15, 21:2, 21:22, 23:10
**implicates** [1] - 11:17
**important** [5] - 7:17, 7:22, 19:7, 19:12, 37:4
**improper** [1] - 29:8
**INC** [2] - 1:4, 1:10
**inclined** [2] - 12:23, 27:11
**include** [2] - 6:23, 9:16
**included** [6] - 5:22, 16:4, 22:15, 24:19, 25:10, 25:11
**including** [1] - 10:24
**incumbent** [1] - 14:7
**Independent** [1] - 31:5
**indicated** [1] - 32:9
**indication** [1] - 13:10
**indirectly** [2] - 11:13, 36:5
**information** [92] - 4:11, 4:12, 4:15, 4:19, 4:21, 5:20, 5:21, 7:5, 7:10, 7:11, 7:19, 8:4, 8:5, 8:8,

8:13, 8:14, 8:19,
8:20, 8:22, 8:23, 9:6,
9:9, 9:16, 9:17, 9:21,
9:23, 9:25, 10:1,
10:8, 10:12, 10:15,
10:19, 10:21, 10:23,
12:1, 14:1, 14:18,
15:17, 16:21, 17:3,
17:21, 17:23, 18:3,
18:7, 18:9, 18:16,
18:17, 18:20, 19:1,
19:4, 19:6, 19:8,
19:9, 19:10, 19:13,
19:14, 19:16, 19:24,
20:1, 21:17, 21:18,
22:9, 22:15, 22:23,
23:2, 23:13, 23:17,
25:1, 25:12, 25:14,
25:16, 25:19, 25:25,
27:8, 29:11, 29:18,
30:2, 30:5, 30:9,
30:14, 34:16, 34:25,
35:7, 36:9, 37:5,
37:15, 38:17, 40:16
**infringe** [5] - 9:3, 12:15,
12:17, 18:5, 25:18
**infringed** [2] - 25:2,
33:9
**infringement** [22] -
7:25, 11:24, 11:25,
12:10, 12:12, 13:7,
14:4, 14:8, 18:17,
19:17, 19:25, 24:4,
28:13, 28:20, 28:21,
30:19, 31:16, 32:25,
33:1, 33:7, 35:12,
40:17
**ingredient** [6] - 4:23,
9:19, 21:10, 21:13,
21:14, 21:19
**ingredients** [5] -
20:19, 20:24, 21:4,
23:11, 26:15
**injunction** [2] - 38:23,
39:4
**injunctive** [2] - 33:7,
33:10
**input** [1] - 31:10
**intended** [2] - 13:11,
18:8
**intent** [3] - 16:23,
18:11, 18:12
**intentionally** [1] -
14:17
**interested** [2] - 17:7,
40:8
**Interrogatory** [1] -
26:19
**intersection** [1] -
13:18

**invalidity** [4] - 13:2,
13:4, 13:5, 14:8
**invented** [1] - 24:11
**involved** [1] - 4:17
**isoforms** [1] - 29:1
**issue** [18] - 8:20,
10:10, 10:11, 11:12,
12:10, 18:19, 25:8,
28:3, 30:19, 32:21,
36:20, 37:10, 37:12,
37:21, 38:3, 38:13,
40:17, 40:25
**issued** [1] - 39:7
**issues** [2] - 24:18,
36:19
**items** [1] - 35:4
**itself** [2] - 7:25, 18:4

## J

**January** [2] - 33:15,
33:22
**JOHN** [1] - 2:2
**John** [1] - 3:11
**joined** [1] - 12:10
**judge** [1] - 31:21
**JUDGE** [1] - 1:18

## K

**keep** [3] - 10:15,
18:10, 18:11
**kind** [12] - 5:2, 5:14,
5:16, 20:7, 20:14,
22:4, 24:23, 27:20,
29:25, 32:3, 34:22,
41:25
**knowing** [2] - 21:3,
23:11
**knowledge** [3] - 5:1,
6:1, 39:10

## L

**LABBE** [57] - 2:2,
3:13, 3:17, 3:22,
4:10, 4:19, 5:4, 5:18,
6:4, 6:10, 6:18, 6:24,
7:4, 7:17, 8:11, 8:14,
8:18, 9:15, 15:4,
16:13, 17:2, 17:20,
18:23, 19:10, 20:13,
20:17, 21:3, 21:10,
22:6, 24:17, 25:7,
26:18, 26:21, 26:23,
27:16, 27:23, 28:7,
28:12, 29:7, 30:1,
32:24, 33:6, 33:15,
33:20, 34:7, 34:15,
34:23, 35:4, 35:14,

37:9, 38:3, 38:16,
39:2, 40:21, 41:15,
41:18, 42:15
**Labbe** [11] - 3:11,
3:15, 4:7, 9:10,
11:16, 13:15, 16:9,
20:7, 26:17, 35:1,
37:25
**lacked** [2] - 25:1,
25:12
**lacking** [1] - 9:23
**lacks** [2] - 9:6, 9:24
**language** [2] - 8:9,
11:17
**large** [1] - 5:11
**last** [1] - 35:6
**launch** [7] - 7:8, 29:6,
32:20, 33:4, 36:24,
38:19, 38:23
**launches** [1] - 37:14
**launching** [1] - 38:11
**law** [2] - 41:5, 41:10
**lawsuit** [8] - 14:14,
14:21, 16:4, 16:8,
28:9, 29:12, 29:23,
34:13
**leads** [1] - 7:17
**learn** [1] - 38:15
**least** [5] - 13:4, 14:11,
18:14, 20:4, 20:11
**leave** [3] - 22:6, 22:12,
23:17
**legitimate** [1] - 36:19
**lEONARD** [1] - 2:20
**less** [3] - 28:7, 40:6,
41:25
**letter** [11] - 11:9,
28:16, 29:16, 35:8,
35:15, 35:25, 36:2,
36:3, 36:10, 36:12,
37:18
**letters** [2] - 4:5, 9:22
**liberally** [1] - 14:14
**likely** [1] - 12:15
**limit** [1] - 24:20
**limitation** [1] - 11:10
**limited** [2] - 19:20,
29:11
**Lin** [5] - 6:11, 6:16,
6:18, 11:9
**line** [3] - 36:13, 37:7,
37:8
**list** [19] - 4:23, 9:2,
9:5, 9:7, 9:19, 14:6,
15:22, 16:12, 21:4,
21:13, 21:15, 22:25,
23:20, 23:21, 24:7,
24:24, 26:1, 26:2,
26:15
**listed** [4] - 16:16,

22:24, 24:24, 24:25
**listing** [1] - 17:20
**litigation** [3] - 14:23,
15:23, 36:20
**live** [1] - 37:3
**LLP** [3] - 2:1, 2:5, 2:8
**long-drawn** [1] - 33:18
**look** [2] - 27:10, 39:16
**looked** [1] - 27:10
**looking** [2] - 26:17,
40:3

## M

**Management** [2] -
3:17, 3:22
**manufacture** [5] -
7:20, 8:2, 8:15,
30:14, 34:4
**manufactured** [4] -
33:8, 33:9, 33:22,
35:18
**manufacturing** [17] -
4:11, 4:12, 4:15, 8:5,
8:8, 8:19, 9:25, 10:1,
10:17, 19:1, 23:4,
25:19, 29:21, 31:23,
32:6, 32:11, 35:17
**market** [1] - 36:24
**marketing** [1] - 38:7
**Marshall** [1] - 3:11
**MARSHALL** [1] - 2:1
**MARYELLEN** [1] -
1:24
**matter** [5] - 11:25,
21:25, 22:12, 28:23,
36:8
**mean** [9] - 13:19, 18:3,
22:3, 22:10, 24:14,
25:4, 33:18, 34:22,
37:10
**medium** [21] - 4:22,
4:25, 5:9, 5:12, 5:17,
5:23, 5:25, 6:17,
6:23, 6:25, 9:14,
11:11, 11:17, 20:16,
20:21, 21:1, 21:4,
21:12, 26:16, 40:3
**Meloro** [14] - 4:2, 4:4,
5:8, 9:12, 11:1, 17:6,
24:21, 25:3, 25:13,
25:22, 28:17, 30:17,
32:3, 35:23
**MELORO** [31] - 2:9,
4:3, 11:2, 11:19,
11:21, 12:6, 12:22,
13:24, 14:15, 15:2,
15:13, 15:19, 16:2,
22:19, 24:6, 24:10,
26:3, 26:5, 27:1,

27:15, 28:18, 28:23,
32:5, 32:17, 36:7,
39:5, 39:12, 40:14,
40:20, 42:3, 42:14
**mentioned** [3] - 11:6,
11:9, 30:5
**mentioning** [2] - 21:6,
38:1
**method** [3] - 18:24,
19:19, 19:21
**methods** [1] - 8:1
**might** [15] - 5:7, 7:15,
12:20, 13:17, 14:16,
15:16, 16:10, 17:17,
20:15, 23:10, 30:20,
38:19, 40:9, 41:12,
41:22
**mind** [4] - 12:19,
14:11, 18:10, 18:11,
38:1, 38:2
**minute** [1] - 31:5
**mixture** [1] - 5:7
**moot** [1] - 40:12
**mORRIS** [1] - 1:23
**most** [4] - 5:18, 26:18,
31:11, 31:22
**Motion** [6] - 3:18,
3:19, 37:11, 37:12,
37:23, 38:5
**motion** [2] - 23:18,
42:4
**motives** [1] - 14:16
**move** [2] - 23:18, 42:5
**moving** [1] - 22:3
**MR** [88] - 3:13, 3:17,
3:22, 4:1, 4:3, 4:10,
4:19, 5:4, 5:18, 6:4,
6:10, 6:18, 6:24, 7:4,
7:17, 8:11, 8:14,
8:18, 9:15, 11:2,
11:19, 11:21, 12:6,
12:22, 13:24, 14:15,
15:2, 15:4, 15:13,
15:19, 16:2, 16:13,
17:2, 17:20, 18:23,
19:10, 20:13, 20:17,
21:3, 21:10, 22:6,
22:19, 24:6, 24:10,
24:17, 25:7, 26:3,
26:5, 26:18, 26:21,
26:23, 27:1, 27:15,
27:16, 27:23, 28:7,
28:12, 28:18, 28:23,
29:7, 30:1, 31:21,
32:5, 32:17, 32:24,
33:6, 33:15, 33:20,
34:7, 34:15, 34:23,
35:4, 35:14, 36:7,
37:9, 38:3, 38:16,
39:2, 39:5, 39:12,

40:14, 40:20, 40:21, 41:15, 41:18, 42:3, 42:14, 42:15
**MS** [2] - 3:9, 31:11
**multiple** [1] - 17:1

## N

**name** [1] - 16:11
**narrow** [4] - 11:6, 11:8, 27:7, 40:12
**narrower** [3] - 7:2, 28:8, 40:15
**narrowly** [1] - 14:12
**nature** [1] - 20:23
**necessarily** [2] - 33:25, 38:18
**necessary** [1] - 11:23
**need** [7] - 13:1, 23:6, 24:1, 26:22, 27:7, 33:4, 42:13
**needs** [2] - 19:16, 29:12
**negotiation** [1] - 16:3
**never** [8] - 9:20, 10:22, 13:17, 18:3, 18:6, 23:9, 23:15
**nevertheless** [1] - 18:25
**next** [2] - 12:16, 22:5
**Nice** [1] - 3:15
**NICHOLS** [1] - 1:23
**NO** [1] - 1:4
**non** [1] - 14:8
**non-infringement** [1] - 14:8
**NOREIKA** [3] - 1:24, 3:9, 31:11
**Noreika** [2] - 3:8, 31:9
**norm** [3] - 31:4, 31:5, 31:10
**normally** [1] - 42:11
**nothing** [2] - 23:5, 35:17
**notice** [4] - 37:13, 38:6, 38:8, 38:21
**notion** [2] - 17:3, 19:16
**number** [6] - 9:13, 16:3, 20:17, 20:23, 24:18
**nutrient** [2] - 6:20, 6:22, 11:12

## O

**o'clock** [3] - 1:12, 3:3, 42:17
**obligation** [1] - 29:24
**obviously** [3] - 24:2,

40:1, 41:16
**occur** [1] - 35:3
**occurred** [2] - 3:3, 34:2
**OF** [2] - 1:2, 1:16
**Official** [1] - 2:21
**often** [1] - 7:11
**one** [18] - 4:20, 5:11, 5:13, 6:10, 7:17, 9:12, 12:4, 14:10, 19:9, 20:4, 20:20, 21:5, 21:10, 21:24, 27:12, 28:25, 29:7, 37:9
**open** [1] - 16:25
**opinion** [3] - 19:15, 19:23, 39:11
**opportunity** [5] - 6:13, 13:1, 14:2, 18:6, 38:22
**oppose** [1] - 23:18
**oral** [3] - 41:6, 41:7, 41:12
**Orange** [1] - 16:17
**order** [1] - 37:2
**Order** [5] - 21:6, 29:10, 37:4, 40:15, 42:11
**original** [4] - 14:23, 15:5, 15:11, 15:13
**overall** [1] - 41:12
**own** [1] - 11:20
**owned** [1] - 25:15
**owns** [2] - 6:5, 20:18

## P

**p.m** [3] - 1:12, 3:3, 42:17
**pages** [2] - 9:12, 9:24
**paper** [2] - 27:20, 29:4
**papers** [1] - 13:14
**Paragraph(2)(a** [1] - 4:13
**part** [4] - 15:24, 17:13, 34:20, 39:2
**particular** [8] - 5:13, 12:11, 14:15, 16:1, 16:3, 23:24, 30:16, 35:25
**particularly** [3] - 14:12, 37:16, 37:21
**parties** [2] - 15:14, 42:5
**past** [1] - 5:8
**Patent** [1] - 24:22
**patent** [39] - 5:3, 6:2, 6:19, 6:16, 6:18, 7:7, 10:2, 11:9, 13:3, 14:4, 15:21, 15:22,

16:1, 16:3, 16:11, 18:24, 18:25, 19:9, 19:19, 19:21, 20:4, 20:7, 20:14, 23:7, 23:19, 25:10, 25:11, 28:9, 28:10, 28:13, 28:19, 28:21, 28:25, 33:9, 35:12
**patents** [69] - 6:5, 6:6, 6:8, 7:14, 7:25, 8:2, 9:2, 9:5, 9:7, 10:17, 14:2, 14:5, 14:7, 14:9, 14:12, 14:13, 15:21, 16:4, 16:6, 16:17, 16:20, 17:16, 17:20, 18:6, 20:8, 20:11, 20:18, 20:23, 21:2, 21:22, 22:2, 22:21, 22:24, 23:19, 23:21, 24:6, 24:8, 24:10, 24:23, 25:1, 25:15, 25:17, 26:1, 26:4, 28:23, 30:3, 32:7, 32:12, 32:13, 32:15, 32:17, 32:23, 32:24, 33:2, 33:5, 34:10, 34:13, 34:19, 35:13, 35:18, 36:5, 36:8, 36:21, 37:7, 40:4, 40:9, 42:6
**patents-in-suit** [1] - 32:17
**pathway** [1] - 10:4
**patience** [1] - 39:21
**paused** [1] - 42:6
**pending** [4] - 15:9, 15:12, 37:10, 42:4
**people** [2] - 13:20, 29:11
**perceive** [1] - 26:7
**percent** [2] - 30:25, 31:8
**perhaps** [4] - 14:16, 35:12, 35:17, 38:17
**peripheral** [1] - 19:8
**permission** [1] - 33:3
**petition** [2] - 15:9, 15:12
**pf** [1] - 13:20
**phraseology** [1] - 11:21
**piece** [2] - 27:20, 29:4
**place** [3] - 9:21, 11:12, 42:5
**plaintiff** [2] - 3:10, 16:5
**Plaintiffs** [2] - 1:6, 1:23
**plaintiffs'** [1] - 39:23
**play** [4] - 14:2, 14:3,

40:12, 40:17
**point** [15] - 6:14, 7:17, 11:13, 14:2, 14:7, 19:2, 22:8, 22:13, 22:25, 24:19, 39:2, 39:25, 40:1, 40:16
**pointed** [1] - 9:20
**pointing** [1] - 41:5
**policy** [1] - 16:23
**portfolio** [1] - 10:2
**position** [14] - 14:16, 14:22, 16:10, 22:17, 23:16, 26:5, 27:19, 28:7, 28:10, 28:17, 28:18, 38:20, 38:22, 40:22
**positions** [1] - 28:6
**possibility** [2] - 33:6, 33:10
**possible** [1] - 14:21
**posts** [1] - 39:6
**posture** [1] - 31:24
**potential** [2] - 30:11, 32:20
**potentially** [3] - 6:4, 15:19, 30:10
**powder** [3] - 21:11, 21:13, 21:16
**pre** [1] - 40:5
**pre-amendment** [1] - 40:5
**precursor** [1] - 5:2
**present** [1] - 16:13
**press** [1] - 38:25
**presumably** [5] - 15:24, 20:8, 23:14, 25:4, 30:20
**pretend** [1] - 21:7
**pretty** [1] - 36:17
**prevent** [4] - 9:8, 10:16, 33:11, 38:23
**previous** [1] - 32:25
**previously** [1] - 22:9
**private** [2] - 18:15, 26:6
**proceedings** [3] - 3:3, 39:19, 42:17
**process** [25] - 5:10, 7:20, 8:4, 8:15, 8:21, 8:22, 10:24, 22:8, 22:11, 22:14, 22:16, 23:4, 25:3, 25:20, 25:21, 25:22, 25:23, 25:24, 29:21, 29:23, 31:23, 32:6, 32:11, 33:19, 35:17
**processes** [2] - 7:20, 8:15
**processing** [1] - 6:18
**PROCTOR** [1] - 2:5

**produce** [8] - 7:19, 17:22, 30:23, 36:6, 36:8, 36:12, 36:14, 37:2
**produced** [8] - 7:14, 10:7, 18:25, 19:1, 31:1, 35:5, 35:6, 40:16
**producing** [2] - 6:19, 32:4
**product** [25] - 4:11, 5:5, 7:7, 7:8, 7:21, 7:25, 8:1, 8:2, 8:16, 10:16, 16:14, 18:9, 21:17, 23:5, 27:24, 28:4, 31:15, 32:6, 32:10, 33:8, 33:23, 36:24, 37:14, 38:12
**production** [3] - 4:18, 17:24, 20:22
**products** [2] - 4:17, 30:15
**progress** [2] - 20:6, 32:9
**promote** [1] - 20:22
**promptly** [1] - 39:6
**proper** [1] - 29:12
**proportionate** [1] - 27:7
**proposed** [1] - 25:23
**proprietary** [1] - 21:13
**Protective** [3] - 21:5, 29:10, 37:4
**protein** [3] - 5:5, 5:6, 20:22
**proteins** [1] - 5:19
**provide** [12] - 4:13, 8:4, 8:7, 8:23, 9:1, 9:18, 14:8, 21:15, 27:8, 28:1, 28:18, 30:21
**provided** [24] - 8:19, 9:21, 10:1, 10:19, 10:21, 10:22, 11:25, 12:11, 14:18, 16:21, 17:3, 19:11, 19:16, 20:2, 21:18, 21:19, 22:9, 30:6, 31:7, 31:12, 31:19, 34:16, 34:20
**provision** [1] - 24:22
**PTO** [1] - 20:12
**public** [4] - 21:8, 29:18, 38:16, 39:10
**publicly** [2] - 36:11, 37:20
**publicly-acknowledged** [1] - 36:11
**purpose** [7] - 7:8,

10:23, 13:16, 13:22,
13:25, 22:13, 29:12
**put** [2] - 14:2, 14:3
**puts** [2] - 16:14, 40:21
**putting** [1] - 18:2

## Q

**questions** [1] - 41:6
**quite** [2] - 35:9, 37:3

## R

**raise** [1] - 8:20
**raised** [1] - 38:13
**raises** [1] - 24:17
**rather** [1] - 34:9
**rational** [1] - 17:9
**read** [1] - 4:5
**reading** [1] - 9:7
**ready** [1] - 29:6
**real** [1] - 12:15
**really** [11] - 11:3,
12:21, 13:15, 19:2,
19:24, 34:7, 34:13,
36:20, 39:25, 40:2,
40:24
**reason** [11] - 6:1, 6:2,
8:3, 16:19, 17:2,
25:16, 29:7, 29:8,
29:9, 36:13, 40:13
**reasonable** [2] -
17:25, 25:2
**reasonableness** [3] -
9:3, 16:18, 26:1
**reasonably** [6] - 7:14,
9:2, 14:4, 16:20,
21:2, 22:22
**reasons** [5] - 4:20,
18:6, 29:14, 30:7,
34:24
**receive** [2] - 10:12,
36:10
**received** [3] - 29:15,
35:5, 35:9
**receives** [1] - 38:9
**receiving** [1] - 30:9
**recess** [3] - 39:18,
39:19, 41:5
**recombinant** [1] - 5:6
**record** [2] - 21:8,
37:24
**reevaluate** [1] - 41:1
**reference** [4] - 10:16,
16:13, 17:15, 18:9
**referred** [1] - 19:13
**referring** [1] - 24:21,
38:3
**refers** [1] - 11:10
**refused** [2] - 36:10,

36:12
**refusing** [1] - 38:6
**regarding** [6] - 4:11,
7:7, 7:25, 8:19, 9:17,
30:8
**regardless** [1] - 13:16
**rejections** [1] - 30:8
**related** [1] - 36:7
**relates** [3] - 28:2,
28:25, 29:1
**relating** [2] - 19:9,
27:21
**relation** [1] - 34:5
**release** [1] - 38:25
**relevance** [7] - 7:1,
11:5, 12:23, 12:24,
13:6, 13:11, 37:6
**relevant** [26] - 6:2, 6:4,
6:8, 6:10, 7:5, 11:24,
18:22, 19:21, 27:6,
28:8, 28:9, 28:13,
28:14, 28:15, 28:19,
29:23, 30:7, 30:8,
30:10, 35:11, 35:19,
37:16, 37:22, 40:18
**reliance** [1] - 40:25
**relied** [2] - 19:3, 19:4
**relief** [2] - 33:7, 33:10
**remains** [1] - 9:24
**remember** [2] - 23:22,
42:9
**reminded** [1] - 41:10
**repeatedly** [1] - 19:13
**Reporter** [2] - 2:20,
2:21
**representing** [1] -
3:10
**request** [3] - 4:9, 4:10,
39:23
**requested** [2] - 9:16,
14:18
**requesting** [1] - 4:23
**require** [3] - 17:22,
20:18, 20:20
**required** [13] - 4:13,
8:6, 8:25, 9:1, 9:5,
10:4, 10:7, 19:13,
19:25, 23:5, 35:16,
38:10
**requirement** [4] - 9:3,
9:4, 17:24
**requires** [2] - 8:4, 8:18
**resolve** [1] - 7:7
**resolved** [1] - 17:14
**respect** [2] - 27:24,
42:3
**respects** [1] - 16:15
**respond** [2] - 26:3,
35:10
**responded** [3] - 23:9,

23:15, 28:1
**responding** [1] -
11:21
**response** [7] - 29:16,
35:8, 35:15, 35:25,
36:2, 36:3, 37:18
**responses** [1] - 37:18
**result** [1] - 16:5
**review** [1] - 15:4
**reviewing** [2] - 7:11,
9:8
**RICHARD** [1] - 1:17
**ridiculous** [3] - 9:13,
11:16, 11:18
**risk** [1] - 32:20
**road** [2] - 23:24, 24:1
**round** [1] - 24:15
**routine** [3] - 31:6,
31:8, 32:8
**routinely** [2] - 30:6,
32:20
**rubric** [1] - 26:12
**Rule** [5] - 11:4, 13:11,
18:11, 22:12, 26:12
**ruled** [1] - 18:15
**Rules** [1] - 13:18
**ruling** [6] - 19:23,
20:5, 26:14, 27:12,
40:21

## S

**sandbagging** [1] -
23:15
**Sandoz** [18] - 4:14,
10:5, 10:7, 10:11,
14:25, 15:2, 15:8,
18:13, 18:20, 18:25,
19:3, 19:22, 27:10,
38:8, 38:10, 39:17,
39:24, 40:25
**saw** [2] - 4:16, 13:13
**schedule** [1] - 42:5
**scope** [1] - 6:25
**seated** [1] - 3:6
**second** [5] - 6:15,
15:20, 24:15, 33:14,
33:15
**secret** [2] - 10:16, 20:9
**Section** [5] - 7:18,
24:21, 26:7, 26:8,
26:10
**see** [9] - 3:15, 13:6,
22:23, 23:7, 27:11,
28:16, 31:22, 36:18,
36:22
**seek** [6] - 18:17, 22:6,
22:12, 34:23, 38:23,
39:4
**seeking** [6] - 4:11,

4:19, 22:1, 23:17,
25:16, 32:25
**seem** [5] - 11:15,
34:12, 35:9, 36:20,
37:4
**selling** [1] - 24:3
**sense** [2] - 24:12, 42:7
**separate** [2] - 10:10,
34:5
**serves** [1] - 42:11
**serving** [1] - 13:2
**set** [4] - 17:24, 25:20,
25:22, 25:24
**sets** [1] - 11:3
**several** [1] - 22:20
**shoes** [1] - 15:15
**significantly** [1] -
36:17
**silent** [1] - 23:14
**simply** [4] - 11:10,
14:6, 18:5
**single** [2] - 27:20, 29:3
**situation** [2] - 14:17,
24:12
**situations** [1] - 31:13
**six** [1] - 41:17
**skip** [1] - 6:6
**so-called** [1] - 15:21
**someone** [1] - 14:16
**somewhat** [1] - 40:22
**somewhere** [2] -
23:23, 24:1
**sorry** [3] - 8:7, 9:10,
37:25
**sort** [1] - 32:2
**sought** [1] - 23:17
**soup** [1] - 5:7
**specific** [8] - 4:11,
4:19, 4:21, 9:17,
9:25, 23:7, 28:10,
28:14
**specifically** [2] - 8:18,
23:2
**speculation** [2] - 9:4
**sponsor** [4] - 10:16,
16:14, 17:15, 18:9
**standard** [4] - 14:12,
16:18, 26:1, 30:23
**standards** [1] - 11:5
**stands** [3] - 15:8,
15:10, 18:14
**start** [4] - 4:7, 24:3,
33:21, 36:23
**state** [1] - 37:24
**STATES** [2] - 1:1, 1:18
**statute** [10] - 7:18, 8:9,
9:8, 9:25, 13:11,
13:20, 13:25, 23:3,
23:21, 25:24
**statutory** [2] - 13:16,

38:24
**stay** [3] - 32:14, 32:18,
32:19
**stayed** [1] - 23:13
**step** [1] - 6:19
**stick** [1] - 39:14
**still** [2] - 22:23, 40:17
**stop** [1] - 33:5
**strike** [1] - 17:9
**strikes** [1] - 31:4
**stuff** [3] - 16:24,
17:18, 35:2
**subject** [7] - 8:16,
27:24, 28:23, 36:8,
37:11, 37:22, 38:5
**submission** [1] -
29:17
**submit** [1] - 22:21
**subsequently** [1] -
20:3
**substance** [1] - 5:2
**substantive** [2] - 12:8,
32:10
**succinctly** [1] - 26:18
**sue** [5] - 14:5, 17:8,
19:18, 24:3, 24:6
**suffice** [1] - 11:9
**sufficient** [3] - 10:19,
18:18, 25:1
**suggest** [1] - 19:20
**suggested** [1] - 29:8
**suit** [6] - 4:12, 18:17,
19:25, 28:13, 32:17,
34:6
**suitable** [4] - 6:12,
6:20, 6:22, 11:12
**sum** [1] - 28:5
**supplement** [2] -
29:25, 30:1
**supposed** [2] - 16:19,
21:6
**suspect** [1] - 21:14
**sympathetic** [1] -
19:15

## T

**table** [1] - 30:18
**tact** [1] - 13:22
**talks** [2] - 35:12, 35:24
**technical** [1] - 32:6
**term** [1] - 5:8
**terms** [4] - 4:8, 9:11,
11:11, 13:19, 33:7,
41:24
**THE** [87] - 1:2, 1:17,
3:5, 3:12, 3:14, 3:20,
3:24, 4:4, 4:15, 4:25,
5:14, 5:24, 6:6, 6:15,
6:22, 7:2, 7:13, 8:7,

8:12, 8:17, 9:10, 10:25, 11:1, 11:15, 11:20, 12:4, 12:15, 13:13, 14:10, 14:25, 15:18, 15:24, 16:9, 16:22, 17:6, 18:20, 19:6, 20:7, 20:14, 20:25, 21:7, 21:25, 22:17, 23:22, 24:8, 24:14, 25:4, 26:4, 26:13, 26:20, 26:22, 26:24, 27:3, 27:17, 27:25, 28:11, 28:16, 28:21, 29:2, 29:22, 30:16, 31:25, 32:1, 32:15, 32:22, 33:3, 33:13, 33:17, 33:24, 34:12, 34:21, 35:1, 35:8, 35:22, 36:16, 37:25, 38:14, 39:1, 39:8, 39:13, 39:21, 40:18, 41:4, 41:16, 41:20, 42:8, 42:16

**theories** [2] - 15:18, 17:7

**theory** [2] - 17:8, 24:4

**therefore** [1] - 28:14

**they've** [4] - 9:20, 37:17, 38:15, 38:18

**thinking** [2] - 14:11, 15:15

**THOMAS** [1] - 2:9

**thoughts** [1] - 22:19

**thousands** [1] - 9:24

**three** [1] - 8:21

**timing** [7] - 29:12, 30:4, 31:14, 34:25, 36:19, 37:15, 39:9

**today** [5] - 14:20, 15:9, 15:10, 36:13, 41:6

**Tom** [1] - 4:2

**took** [1] - 14:22

**topics** [1] - 41:12

**towards** [1] - 17:11

**transcript** [1] - 42:11

**TRANSCRIPT** [1] - 1:16

**treatment** [3] - 18:25, 19:19, 19:21

**trial** [1] - 30:13

**true** [1] - 25:21

**trumps** [1] - 11:4

**try** [2] - 14:17, 24:20

**trying** [3] - 17:4, 26:12, 34:2

**TUNNELL** [1] - 1:23

**two** [13] - 12:16, 27:5, 28:5, 32:12, 32:15, 33:5, 33:14, 33:15, 34:14, 34:15, 36:21,

40:16, 42:6

**type** [1] - 30:9

**types** [1] - 30:8

**typically** [1] - 33:17

## U

**under** [23] - 4:13, 4:14, 6:20, 7:6, 7:24, 8:1, 8:25, 9:7, 10:11, 11:11, 15:8, 17:9, 18:2, 19:13, 21:5, 22:5, 22:8, 22:10, 26:12, 33:9, 38:8, 38:9, 41:2

**underlying** [2] - 18:7, 18:8

**undermined** [1] - 10:24

**undetected** [1] - 19:17

**unfavorably** [1] - 23:25

**unhappy** [1] - 36:15

**uninformed** [2] - 9:4, 18:1

**UNITED** [2] - 1:1, 1:18

**unless** [1] - 38:25

**unlike** [1] - 36:18

**unrelated** [2] - 29:4, 32:5

**up** [12] - 5:12, 12:19, 13:4, 14:17, 15:23, 17:4, 23:25, 28:5, 31:13, 37:3, 41:9, 41:11

**usual** [2] - 32:19, 36:16

## V

**variation** [1] - 26:16

**various** [1] - 17:7

**vats** [1] - 5:11

**vertebrate** [1] - 6:20

**view** [5] - 7:1, 28:8, 28:12, 28:13, 30:5

**violated** [2] - 14:19, 38:6

**violation** [5] - 10:6, 10:12, 14:21, 14:24, 26:7

**vs** [1] - 4:14

## W

**wait** [3] - 12:19, 32:22, 38:10

**waiting** [2] - 38:24, 42:1

**wave** [2] - 16:4, 16:7

**Waxman** [5] - 7:23, 7:24, 30:6, 30:23, 32:13

**ways** [1] - 20:11

**website** [1] - 39:3

**week** [1] - 13:2

**weeks** [4] - 12:16, 27:5, 40:16, 41:17

**whole** [1] - 10:23

**WILLKIE** [1] - 2:8

**Willkie** [1] - 4:2

**withheld** [1] - 20:1

**wonder** [1] - 34:3

**wondering** [2] - 17:12, 17:13

**words** [3] - 11:20, 28:12, 39:8

**works** [1] - 15:22

**write** [2] - 41:8, 41:11

## Y

**year** [8] - 8:24, 12:20, 15:14, 22:15, 22:20, 29:18, 33:16, 35:6

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on  July 8, 2016
by:

☐ U.S. Mail

☐ Fax

☐ Hand

☒ Electronic Means (by E-mail or CM/ECF)

| | |
|---|---|
| Michael W. Johnson | /s/ Michael W. Johnson |
| Name of Counsel | Signature of Counsel |

| | |
|---|---|
| Law Firm | Willkie Farr & Gallagher LLP |
| Address | 787 Seventh Avenue |
| City, State, Zip | New York, New York 10019-6099 |
| Telephone Number | (212) 728-8137 |
| Fax Number | (212) 728-9137 |
| E-Mail Address | mjohnson@willkie.com |

NOTE: For attorneys filing documents electronically, the name of the filer under whose log-in and password a document is submitted must be preceded by an "/s/" and typed in the space where the signature would otherwise appear. Graphic and other electronic signatures are discouraged.

Reset Fields